**Edward M. FEDER, Plaintiff,**

**v.**

**Melissa Ann EVANS–FEDER, Defendant.**

**Civ. A. No. 94–5909.**

United States District Court,
E.D. Pennsylvania.

Oct. 31, 1994.

Ann G. Verber, Roger P. Cameron, Philadelphia, PA, for plaintiff.

Norman Perlberger, Bala Cynwyd, PA, for defendant.

### MEMORANDUM

BARTLE, District Judge.

Petitioner, Edward M. Feder ("Mr. Feder") has brought the present action against his estranged wife, Melissa Ann Evans–Feder ("Mrs. Feder") pursuant to the 1980 Hague Convention on Civil Aspects of International Child Abduction ("Hague Convention") and its implementing legislation, The International Child Abduction Remedies Act of 1988, 42 U.S.C. §§ 11601–11610 ("ICARA"). The Hague Convention is a treaty providing for the return of a child to the country of his or her "habitual residence" when a parent has wrongfully removed or retained the child in violation of the other parent's custody rights. Mr. Feder seeks to have this court order the return of their four year old son, Charles Evan Feder ("Evan"), to Australia, where Mr. Feder currently resides. This would allow an Australian court to determine issues of custody. Mrs. Feder, who lives in Pennsylvania with Evan, opposes the petition.

The court held an evidentiary hearing on October 14, 1994. The following constitutes the court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure.

The Feders are American citizens who met while each was working in Germany—she as an opera singer, and he as an employee of Citibank. Evan, the Feders' only child, was born in Germany on July 3, 1990. Evan is also an American citizen.

Around the time of Evan's birth, Mr. Feder began looking for new employment. When Evan was approximately four months old, Mr. Feder obtained a management position with CIGNA in Philadelphia, Pennsylvania. In October of 1990, the Feders moved to Jenkintown, Montgomery County, Pennsylvania, a suburb of Philadelphia, where they purchased a home. This move brought the Feders closer to Evan's maternal grandparents, who live in Waynesboro, Franklin County, Pennsylvania, and his paternal grandmother, who lives in New Jersey. At the age of two Evan began nursery school in Jenkintown.

In the summer of 1993, after Mr. Feder lost his job with CIGNA, he met with a personnel recruiter for the Commonwealth Bank of Australia. Mr. Feder was interested in an available position. When Mrs. Feder expressed reluctance about living in Australia, Mr. Feder encouraged her to visit the country on a trip arranged by the bank. He told her that she should consider it as a free vacation and that she had nothing to lose. Mrs. Feder eventually agreed to accompany her husband on a two-week trip to Australia in August of 1993.

While there, the Feders investigated the Sydney area where Mr. Feder would be working if he accepted the position. The

Feders consulted an accountant regarding the cost of living in the country and met with a relocation consultant and real estate agents. Mrs. Feder also spoke with a representative of the Sydney Opera during her trip. The Feders returned to Jenkintown during the first week of September of 1993.

Commonwealth Bank offered Mr. Feder a position as the general manager of its personal banking department in late August or early September of 1993. During the first week of September, the Feders met with a financial analyst in Philadelphia about the compensation package the bank proposed. Mr. Feder considered the position at Commonwealth Bank to be advantageous both professionally and financially. Although Mrs. Feder remained opposed to the idea of moving to Australia, Mr. Feder formally accepted the Commonwealth Bank position on September 16, 1993. Bank officials told Mr. Feder that the bank needed him to begin work as soon as possible because the position had been vacant for some time.

Mrs. Feder was very reluctant to make such a major move. She was skeptical about how long they would be staying in any event due to her husband's employment history. He had worked for four different employers in ten different cities in seven different countries on four different continents in the past twenty years, and she did not want to relocate to a foreign country now that they had a child. Moreover, she was deeply concerned about the adverse effect any move would have on their marriage and their family life. The Feders' marital relationship had been deteriorating during the period Mr. Feder worked for CIGNA, where he was required to spend approximately 65% of his time traveling. Stress due to the loss of his job worsened the problems in the marriage. Both of the Feders had sought counseling from a therapist because of the problems they were experiencing.

Despite his wife's misgivings, Mr. Feder remained committed to moving to Australia. He had not seriously considered any job openings in the United States although Mrs. Feder had urged him to do so. Mrs. Feder consulted a divorce attorney in October of 1993. However, she decided not to initiate divorce proceedings at that time. She did not want to end their marriage without making a further try to salvage it and she did not believe she could support herself and her child while pursuing a divorce.

Later that month, Mr. Feder flew to Australia to begin work, leaving Mrs. Feder and Evan in Jenkintown. Mrs. Feder planned to stay in Jenkintown with Evan until they sold their house, by which time she hoped to be able to decide whether to end the marriage. Mrs. Feder did not oppose listing the house with a real estate agent since she would not be able to afford to live in such a large home if she were to divorce her husband.

Between the time Mr. Feder accepted the Commonwealth Bank position and the last week of October, 1993 when he moved, the Feders sold household items which would not be useful in Australia. After he moved, Mr. Feder sent Mrs. Feder photographs of houses he was considering in the Sydney area. In November of 1993, he purchased in both their names a 50% interest in a house in St. Ives, a suburb of Sydney. Mrs. Feder signed no papers pertaining to the transaction. Commonwealth Bank financed the entire 50% interest Mr. Feder bought and purchased the remaining 50% interest itself. Mr. Feder told his wife that he had purchased the house as a "surprise birthday present" for her.

Mr. Feder returned to Jenkintown on December 13, 1993. Although they still had not sold their home, he told his wife that he had arranged for a moving company to ship the furniture to Australia in approximately two weeks. Most of this furniture belonged to him before their marriage. Mr. Feder, a gun enthusiast, also had his gun collection moved to Australia. By the time he returned to Jenkintown, he had already purchased airline tickets to Australia for his wife and son. With great reluctance, Mrs. Feder accompanied him to Australia with Evan. She did so, without any commitment to remain there, in a last attempt to save her troubled marriage.

The Feders began their flight on January 3, 1994, and after stops in California and Hawaii, arrived in Australia on January 8. Since the house in St. Ives needed renova-

tions, the family spent approximately four and a half months in a hotel and then an apartment before moving into the house in May.

The Feders' marriage worsened in Australia. Mrs. Feder told her husband early that spring that she wanted to end the marriage, take Evan, and return to the United States. Mr. Feder attributed their marital problems to the stress and demanding hours of his new job. He asked her to stay so they could try to work out their problems after they moved into their new home and he adjusted to his job. Mrs. Feder also did not want to disrupt Evan's time in nursery school by returning with him to the United States before the school term had ended.

Moving into the house in St. Ives at the end of May, 1994 did not improve the couple's relationship. After a particularly serious argument in June, Mrs. Feder decided that it was time she left her husband and returned to the United States. Later that month she told him that she wanted to take Evan to visit his grandparents in the United States. She did not believe that Mr. Feder would let them leave the country otherwise. Mr. Feder bought them round-trip tickets for a departure on June 29 and a return flight on August 2, 1994. Mr. and Mrs. Feder had another argument very shortly before her departure. Mr. Feder admitted she said to him at that time that perhaps she and Evan should stay in the United States and not return. Nevertheless, Mr. Feder drove his wife and child to the airport as scheduled. Mrs. Feder and Evan left Australia and stayed temporarily with her parents in Waynesboro, Pennsylvania after their arrival in the United States.

Mr. Feder came to the United States on business in July of 1994. When he went to the couple's Jenkintown home to meet his wife and attend to some errands, Mrs. Feder had him served with a divorce complaint and papers seeking custody of Evan. Mr. Feder returned to Australia shortly thereafter. After obtaining furniture and appliances to replace those which had been sold or shipped to Australia, Mrs. Feder and Evan moved back into the home in Jenkintown.

Before she had left Australia, Mrs. Feder had taken some steps to become acclimated to that country. In the spring of 1994, in an effort to obtain some professional fulfillment, she auditioned for a role with the Sydney Opera. The opera hired her to sing in one performance in February of 1995. The performance required her participation in two weeks of rehearsals in December of 1994. Since Mr. Feder was busy at work, she handled many of the decisions regarding the renovations of the St. Ives house. She allowed Evan to attend nursery school three days a week. At the urging of her neighbors, she put his name on a waiting list for a private school so that he might have a chance of attending it some seven years later when he turned eleven. On the application, she answered "yes" to the question, "Is the boy an Australian citizen or with permanent resident status?" even though he was and is not.

Mr. Feder switched his driver's license registration from Pennsylvania to Australia before Australian law legally required him to do so. As he explained, he was a "guest" of Australia working in a bank with close governmental ties and believed he should apply promptly. Although he urged Mrs. Feder to do the same, she refused to surrender her Pennsylvania driver's license. Similarly, Mr. Feder had Commonwealth Bank submit an application for permanent residency status for the entire family. However, neither Mrs. Feder nor Evan ever took the necessary physical examination. Moreover, Mrs. Feder never signed any papers to become a permanent resident. On the other hand, the Feders did obtain Australian Medicare cards so that they could receive any necessary medical treatment.

■ It must be emphasized that the Hague Convention does not authorize this court to decide which parent is entitled to custody of Evan. As the Court of Appeals for the Sixth Circuit has held, "[t]he rights and wrongs of the actions of the respective parents are not before us for disposition on the merits." *Friedrich v. Friedrich,* 983 F.2d 1396, 1402 (6th Cir.1993). Rather, this court's limited function is to determine, under the provisions of the Hague Convention and enabling legislation, whether the courts

of Australia or of Pennsylvania should decide custody issues regarding the child. *Id.* at 1403.

The preamble to the Hague Convention states a goal of protecting "children internationally from the harmful effects of their wrongful removal or retention and [establishing] procedures to ensure their prompt return to the State of their habitual residence." Both Australia and the United States are signatories of the treaty. A removal or retention is wrongful when:

  *a* it is in breach of rights of custody attributed to a person, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

  *b* at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, Article 3. The parties agree that they both had and were exercising rights of custody at the time that Mrs. Feder brought Evan back to Pennsylvania.

The petitioner, Edward Feder, has the burden of proving by a preponderance of the evidence that the refusal of respondent, Melissa Ann Evans–Feder, to return Evan to Australia constituted a wrongful retention of Evan in the United States. 42 U.S.C. § 11603(e)(1)(A); *see also In re Ponath,* 829 F.Supp. 363, 365 (D.Utah 1993). To meet his burden, Mr. Feder must establish that Evan was "habitually resident" in Australia at the time of the wrongful retention. *Friedrich,* 983 F.2d at 1399; *see also In re Cohen,* 158 Misc.2d 1018, 602 N.Y.S.2d 994, 998 (Sup.Ct. 1993). Neither the Hague Convention nor its enabling legislation, ICARA, defines habitual residence, and only a few cases have analyzed the meaning of the term.

In a frequently cited decision from the United Kingdom, the High Court of Justice explained:

  the notion [of habitual residence is] free from technical rules, which can produce rigidity and inconsistencies as between legal systems.... The facts and circumstances of each case should continue to be assessed without resort to presumptions or presuppositions.... All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled.

*In re Bates,* No. CA 122.89 at 9–10, High Court of Justice, Fam.Div'n Ct.Royal Court of Justice, United Kingdom (1989) (citation omitted). The *Friedrich* court, citing *Bates* with approval, agreed that the analysis is highly fact-sensitive and should not be confused with technical legal concepts such as domicile. 983 F.2d at 1401; *see also Ponath,* 829 F.Supp. at 368. The *Friedrich* court further held that

  [t]o determine the habitual residence, the court must focus on the child, not the parents, and examine past experience, not future intentions.... [H]abitual residence can be "altered" only by a change in geography and the passage of time....

983 F.2d at 1401. The parties agree that the United States was Evan's habitual residence at least until January of 1994. Accordingly, this court must determine whether the time Evan spent in Australia, which was slightly less than six months, altered this status.

Mr. Feder argues that this court should be guided by *Roszkowski v. Roszkowska,* which he contends is virtually identical to the matter at hand. 274 N.J.Super. 620, 644 A.2d 1150 (1993). The boy in the *Roszkowski* case was born in Poland to Polish parents. When the child was seven months old, Mr. Roszkowski moved to the United States in search of employment. His wife remained in Poland with the child until he was nearly four years old, at which time they moved to Mr. Roszkowski's residence in New Jersey. The couple separated almost immediately, and the child spent a few days of every week with each parent. After the boy had lived in New Jersey for slightly over six months, his mother sent him back to live in Poland with her relatives, although both she and Mr. Roszkowski remained in the United States. Mr. Roszkowski successfully petitioned for his return to the United States, even though his mother had returned him to the country in which he had spent nearly four years. Mr. Feder argues that this court should follow this precedent and return Evan to Australia.

■ The case at bar differs from *Rosz-kowski* in several crucial respects. The most obvious distinction is that in *Roszkowski*, both of the parents lived in and intended to remain in the United States, the country to which the child was to be returned. Secondly, the *Roszkowski* court relied on analogies to New Jersey's version of the Uniform Child Custody Jurisdiction Act in its analysis of "habitual residence." [1] This Act required the child to live in New Jersey for six consecutive months, which requirement had been satisfied in *Roszkowski*. This court rejects the analysis used by the *Roszkowski* court. As *Bates, Friedrich* and *Ponath* held, the Hague Convention presumes that courts will carefully examine the facts and circumstances of a particular case in determining habitual residence. Nowhere does this international treaty suggest that it is appropriate to borrow an arbitrary cutoff date from a state statute in determining whether habitual residence has been established.

■ Mr. Feder also contends that this court must extend "full faith and credit" to a determination made by the Family Court of Australia that Evan is a habitual resident of Australia. Section 11603(g) of ICARA states that

[f]ull faith and credit shall be accorded by the courts of the States and the courts of the United States to the judgment of any other such court ordering or denying the return of a child, pursuant to the Convention, in an action brought under this chapter.

42 U.S.C. § 11603(g). The court also notes that pursuant to Article 15 of the Hague Convention,

[t]he judicial or administrative authorities of a Contracting State may, prior to the making of an order for the return of the child, request that the applicant obtain from the authorities of the State of the habitual residence of the child a decision or other determination that the removal or retention was wrongful within the meaning of Article 3 of the Convention....

Hague Convention, Article 15. Mr. Feder, on his own initiative and not at the request of this court, petitioned a family court in Australia for a determination of Evan's habitual residence. It appears that Mrs. Feder received notice of this proceeding but did not enter an appearance. Articles 7(e), 8(f) and 14 of the Hague Convention permit Australian judicial or administrative authorities to advise this court of relevant laws of that country, such as those pertaining to custody or the wrongfulness of a particular removal or retention. However, it does not appear that the Australian Family Court had jurisdiction to determine the issue of Evan's habitual residence. The Hague Convention leaves this issue to the judicial or administrative authorities of the country in which the child is living at the time of the petition. *See* 42 U.S.C. § 11603(b); Hague Convention, Article 12. Evan was in the United States at the time Mr. Feder's petition was filed. Mr. Feder did not petition the Australian Family Court for, nor did that court enter, a "judgment ... ordering or denying the return of a child, pursuant to the Convention." 42 U.S.C. § 11603(g). Accordingly, this court is not bound by the Australian determination and will render its decision based on the facts before it.

■ Mr. Feder argues that various actions taken by the parties demonstrate that the family, including his wife, had a settled purpose of remaining in Australia. He claims that Mrs. Feder must have intended to stay in Australia because she auditioned for and received a role in a single operatic performance to take place in Sydney in February of 1995, with two weeks of rehearsals scheduled for December of 1994. Mrs. Feder correctly explains that opera singers regularly perform in foreign countries without living there or changing their residence. She herself performed in numerous countries during her operatic career without remaining in those countries for lengthy periods of time.

■ Mr. Feder next points to the fact that Mrs. Feder put Evan on a waiting list to qualify him some seven years in the future

1. The enabling legislation for the Hague Convention provides that "[t]he courts of the States and the United States district courts shall have con-current original jurisdiction of actions arising under the [Hague] Convention." 42 U.S.C. § 11603(a).

for a private school in the Sydney area. Mrs. Feder indicated on the application that Evan had permanent residency status in Australia, although that was indisputably not true at the time. This court finds little significance in this. Australian acquaintances told Mrs. Feder that the school was so competitive that she must apply for Evan years in advance if he were to have any chance of being admitted. Evan undoubtedly would have obtained permanent residency status by the time of enrollment if the Feders' marriage had improved and they did remain in the country. Mrs. Feder testified convincingly that she was not committing Evan or herself to remain in Australia. She merely sought to ensure that he had the opportunity to obtain a fine education if they eventually were to decide to stay. The application would not be binding in any way if she and Evan or the entire family left Australia before Evan turned eleven.

■ Mr. Feder also notes that the family applied for and received Australian Medicare cards which would entitle them to receive medical treatment under Australia's national health care system. Mr. Feder himself testified that the application procedures were so minimal that they felt it would be only prudent to apply. This court does not find the decision to protect themselves if the need arose for medical care to be indicative of a settled purpose of remaining in Australia.

■ Mr. Feder argues that their decisions to sell their American home, sell or ship their American furniture and to purchase and renovate extensively a house in Australia indicate a settled purpose to remain there. While this argument has initial appeal, numerous important factors drastically undermine the conclusion Mr. Feder attempts to draw from these facts. As this court found above, Mrs. Feder agreed to sell their home in Jenkintown based on her belief that she and Evan could not afford to live there without her husband. Second, her unrebutted testimony establishes that the majority of the furniture belonged to him from before their marriage and that he was free to do with it as he pleased. Third, Mrs. Feder did not

participate in the decision to purchase their half interest in the house in St. Ives, Australia.[2] The bank paid all of the renovation expenses. Mrs. Feder naturally made many of the renovation arrangements, as Mr. Feder was working very long hours, and she was eager to complete the project in the event their marriage would improve.

Mrs. Feder argues that the *Ponath* case supports her position that Evan did not establish a new habitual residence by moving to Australia. 829 F.Supp. at 363. In *Ponath*, a child was born in Utah to an American mother and a German father. The family spent the first five months of the child's life in Utah before traveling to Germany. The father obtained employment in Germany and began building a house for the family near his parents' residence.

After the child had been in Germany for eleven months, the parents separated and the mother returned to Utah with the child. The father filed a petition under the Hague Convention seeking the return of the child to Germany. Although the child had lived in Germany more than twice as long as he had lived in Utah, the court held that the father did not establish a change in the boy's habitual residence. The court reasoned that

> [a]lthough it is the habitual residence of the child that must be determined, the desires and actions of the parents cannot be ignored by the court in making that determination when the child was at the time of removal or retention an infant. The concept of habitual residence must, in the court's opinion, entail some element of voluntariness and purposeful design. Indeed, this notion has been characterized in other cases in terms of "settled purpose."

*Id.* at 367. The court found that although the mother had traveled to Germany voluntarily, she remained there with the child only because her husband coerced her to do so. Despite the father's demonstrated intent to remain in Germany, the court found that the mother had no such settled purpose. Accordingly, the court held that the father had not demonstrated by a preponderance of the evidence that Germany became the child's

---

**2.** The Feders paid rent on the half of the house owned by the bank.

habitual residence during the eleven months he lived there.

The *Ponath* decision is more persuasive than the *Roszkowski* decision and is closer to the facts of this case. Mrs. Feder's testimony regarding her extreme reluctance to move herself and her son to Australia is credible and consistent with her actions. Faced with a choice between abruptly ending her marriage and remaining in an unfurnished home with no visible means of support for herself and her son or following her husband to Australia in a last attempt to keep her family together, Mrs. Feder moved to Australia. Her move was on a temporary, trial basis only. Unlike her husband, she refused to surrender her Pennsylvania driver's license and took no steps herself to become a permanent resident of Australia. Because her marriage worsened rather than improved in Australia, she never developed a settled purpose to remain. In fact, in less than six months she decided that her marriage could not be saved. With this decision, she ended her trial period in Australia and returned with Evan to the United States, where they are both citizens. She travelled back to Pennsylvania with her son because that was and is their home, where Evan spent the vast majority of his life, and where their family and friends are located.

Mr. Feder argues that Evan himself was habitually resident in Australia because he attended an Australian preschool a few days each week and had made some friends there. While this court must, of course, decide the habitual residence of the child, a child of four years cannot decide for himself or herself where that habitual residence will be. Such a child does not think about the subject and takes no voluntary or purposeful actions in this regard. Of necessity, we must evaluate the objectives and actions of the parents. As the *Ponath* court similarly explained, "the desires and actions of the parents cannot be ignored" in making a determination in such a case. 829 F.Supp. at 367. Evan's father and mother viewed Australia differently during the short time they were there. Mr. Feder may have considered and even established Australia as his habitual residence by June of 1994 despite his history of frequent relocation, but Mrs. Feder assuredly did not. Significantly, she and Evan spent less than six months in Australia before they left. Under the circumstances here, Mr. Feder has not proven that Evan's habitual residence in the United States as of January 8, 1994 had changed to Australia by the time Mrs. Feder refused to return him from Pennsylvania in the summer of 1994.

Even if Mr. Feder had established that Evan was habitually resident in Australia, that would not end the analysis. The Hague Convention does not require a court to return a child if the respondent demonstrates by clear and convincing evidence that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, Article 13(b). This court heard evidence regarding this subject at the October 14, 1994 hearing. In light of its decision regarding Evan's habitual residence, the court need not resolve this question.

This court finds and concludes that the habitual residence of Charles Evan Feder is in the United States of America and that his mother has not wrongfully retained him here. The petition of Edward Feder to have the child returned to the Commonwealth of Australia is denied.