

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-8-1995

# Feder v Evans-Feder

Precedential or Non-Precedential:

Docket 94-2176

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

## Recommended Citation

"Feder v Evans-Feder" (1995). *1995 Decisions.* Paper 211.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/211

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
———————

No. 94-2176
———————

EDWARD M. FEDER,

<u>Appellant</u>

vs.

MELISSA ANN EVANS-FEDER
———————

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 94-cv-05909)
———————

Argued
June 27, 1995
Before:  MANSMANN, GREENBERG and SAROKIN, <u>Circuit</u> <u>Judges</u>.

(Filed August 8, 1995)
———————

Ann G. Verber, Esquire (ARGUED)
Obermayer, Rebmann, Maxwell & Hippel
15th & Chestnut Streets
Packard Building, 14th Floor
Philadelphia, Pennsylvania 19102

   COUNSEL FOR APPELLANT

Norman Perlberger, Esquire (ARGUED)
Perlberger Law Associates
401 City Avenue
One Bala Plaza, Suite 200
Bala Cynwyd, Pennsylvania 19004

   COUNSEL FOR APPELLEE
———————

OPINION OF THE COURT
———————

1

MANSMANN, Circuit Judge.

In this case of first impression for this circuit, we have before us a petition filed by one parent against the other under the Hague Convention on the Civil Aspects of International Child Abduction. Edward M. Feder asserts that Melissa Ann Evans-Feder "wrongfully retained" their son, Charles Evan Feder ("Evan"), in the United States and requests that Evan be returned to him in Australia. Concluding that the United States was Evan's "habitual residence", Hague Convention, Article 3a, the district court held that the retention was not wrongful and denied Mr. Feder's petition.

We, however, conclude that Australia was Evan's habitual residence and hold that Mrs. Feder's[0] retention of Evan was wrongful within the meaning of the Convention. We will therefore vacate the district court's denial of Mr. Feder's petition and remand the case for a determination as to whether the exception that Mrs. Feder raises to the Convention's general rule of return applies to preclude the relief Mr. Feder seeks.

I.

We begin by reviewing the evidence presented in this case. The facts as found by the district court leading to Mrs. Feder's retention of Evan are not in dispute.

---

[0] Although the caption reads "Evans-Feder", Melissa Ann Evans-Feder refers to herself in her brief as "Mrs. Feder" and we adopt that designation.

2

Mr. and Mrs. Feder are American citizens who met in 1987 in Germany where each was working: she as an opera singer, and he as an employee of Citibank. Evan, their only child, was born in Germany on July 3, 1990.

In October, 1990, the family moved to Jenkintown, Pennsylvania because Mr. Feder had accepted a management position with CIGNA in Philadelphia. When CIGNA terminated Mr. Feder's employment in June of 1993, he began exploring other employment opportunities, including a position with the Commonwealth Bank of Australia. Although Mr. Feder greeted the possibility of living and working in Australia with enthusiasm, Mrs. Feder approached it with considerable hesitation. Nonetheless, that August, the Feders traveled to Australia to evaluate the opportunity, and while there, toured Sydney, the city where Mr. Feder would work if he were to accept the position with Commonwealth Bank. They spoke with Americans who had moved to Australia, consulted an accountant about the financial implications of living in Australia and met with a relocation consultant and real estate agents regarding housing and schools. Mrs. Feder also spoke with a representative of the Australia Opera about possible employment for herself.

In late August or early September of 1993, the Commonwealth Bank offered Mr. Feder the position of General Manager of its Personal Banking Department. Finding the offer satisfactory from a professional and financial standpoint, Mr. Feder was prepared to accept it. Mrs. Feder, on the other hand, was reluctant to move to Australia. She had deep misgivings

about the couple's deteriorating marital relationship; in October, 1993, she consulted with a domestic relations attorney regarding her options, including a divorce. Nevertheless, for both emotional and pragmatic reasons, Mrs. Feder decided in favor of keeping the family together and agreed to go to Australia, intending to work toward salvaging her marriage.

Upon Mr. Feder's acceptance of the bank's offer, the Feders listed their Jenkintown house for sale and sold numerous household items that would not be of use in Australia. Toward the end of October, 1993, Mr. Feder went to Australia to begin work. Mrs. Feder remained behind with Evan to oversee the sale of their house in Jenkintown; Mr. Feder, in the meantime, looked for a house to buy in the Sydney area, sending pictures and video tapes of houses to Mrs. Feder for her consideration. In November of 1993, Mr. Feder purchased, in both his and Mrs. Feder's name, a 50% interest in a house in St. Ives, New South Wales, as a "surprise birthday present" for his wife.[0]

Mr. Feder returned to Pennsylvania on December 13, 1993. Even though the Jenkintown house had not sold, Mr. Feder arranged for a moving company to ship the family's furniture to Australia and bought airline tickets to Australia for Mrs. Feder and Evan. The Feders left for Australia on January 3, 1994, where they arrived on January 8, 1994, after stopping briefly in California and Hawaii. Mrs. Feder was ambivalent about the move;

---

[0]     The Commonwealth Bank purchased the remaining 50% interest and financed the Feder's interest in the house.

4

while she hoped her marriage would be saved, she was not committed to remaining in Australia.

Once in Australia, the Feders finalized the purchase of their St. Ives house, but lived in a hotel and apartment for about four and one-half months while Mrs. Feder supervised extensive renovations to the house. Evan attended nursery school three days a week and was enrolled to begin kindergarten in February, 1995. Mrs. Feder applied to have Evan admitted to a private school when he reached the fifth grade, some seven years later. Although Evan is not an Australian citizen and was not a permanent resident at the time, Mrs. Feder represented to the contrary on the school application.

In an effort to acclimate herself to Australia, Mrs. Feder pursued the contacts she had made during the Feders' August, 1993 trip and auditioned for the Australian Opera Company. She accepted a role in one of the company's performances set for February, 1995, which was scheduled to begin rehearsals in December, 1994.

Mr. Feder changed his driver's license registration from Pennsylvania to Australia before legally obligated to do so and completed the paperwork necessary to obtain permanent residency for the entire family; Mrs. Feder did not surrender her Pennsylvania license nor submit to the physical examination or sign the papers required of those seeking permanent residency status. All of the Feders obtained Australian Medicare cards, giving them access to Australia's health care system.

According to Mrs. Feder, her marriage worsened in Australia. In the early spring of 1994, she and Mr. Feder discussed her unhappiness in the marriage as well as her desire to return to the United States. Mr. Feder attributed the couple's difficulties to the stress of his new job and requested that Mrs. Feder stay in Australia, anticipating that their problems would subside once the family moved into their new home. Once again, for both personal and practical reasons, Mrs. Feder agreed.

The family moved into the St. Ives home in May, 1994; the Feders' relationship, however, did not improve. Ultimately, Mrs. Feder decided to leave her husband and return to the United States with Evan. Believing that Mr. Feder would not consent to her plans if her true intent were known, Mrs. Feder told Mr. Feder that she wanted to take Evan on a visit to her parents in Waynesboro, Pennsylvania in July. Mr. Feder made arrangements for the trip, buying two round-trip tickets for departure to the United States on June 29 and returning to Australia on August 2.

Mrs. Feder and Evan left Australia as scheduled and upon their arrival in the United States stayed with her parents. In July, 1994, Mr. Feder traveled to the United States on business, and arranged to meet his wife and son at their still unsold house in Jenkintown. When Mr. Feder went to the house on July 20, 1994, he was served with a complaint that Mrs. Feder had filed in the Court of Common Pleas of Montgomery County, Pennsylvania on July 14, 1994, seeking a divorce, property distribution, custody of Evan and financial support. Shortly

6

thereafter, Mr. Feder returned to Australia and Mrs. Feder and Evan moved into the Jenkintown house.

In September, 1994, Mr. Feder commenced a proceeding in the Family Court of Australia in Sydney, applying for, inter alia, declarations under the Hague Convention on the Civil Aspects of International Child Abduction. On October 4, 1994, the Judicial Registrar of the Family Court of Australia heard argument and issued an opinion declaring that Evan, Mr. Feder and Mrs. Feder were habitual residents of Australia immediately prior to Mrs. Feder's retention of Evan in the United States; that Mr. Feder had joint rights of custody of Evan under Australian law and was exercising those rights at the time of Evan's retention; and that Mrs. Feder's retention of Evan was wrongful within the meaning of the Convention.[0]

On September 28, 1994, Mr. Feder commenced this action against Mrs. Feder by filing a petition pursuant to the Convention in the United States District Court for the Eastern District of Pennsylvania, alleging that his parental custody rights had been violated by Mrs. Feder's "wrongful removal and/or

---

[0]      Mrs. Feder was served with the Judicial Registrar's opinion on October 7, 1994. Mrs. Feder did not enter an appearance in the Australian court, although the record indicates that she received notice of the proceeding. In his brief, Mr. Feder informs us that the Australian action is pending and includes a request on his part for custody of Evan.

In the district court, Mr. Feder requested that "full faith and credit" be extended to the Judicial Registrar's declaration that Evan was a habitual resident of Australia. The court refused Mr. Feder's request. Feder v. Evans-Feder, 866 F. Supp. 860, 866 (E.D. Pa. 1994). This issue was not raised on appeal.

7

retention"[0] of Evan and requesting the child's return.  Mrs.
Feder opposed the petition, denying that Evan's removal from
Australia and retention in the United States were wrongful and
asserting that even if they were, Evan cannot be returned to
Australia because there is a "grave risk" that his return will
expose him to "physical or psychological harm" or place him in an
"intolerable situation."

On October 14, 1994, the district court conducted an
evidentiary hearing and on October 31, 1994, issued an opinion
and order denying Mr. Feder's petition.  Feder v. Evans-Feder,
866 F. Supp. 860 (E.D. Pa. 1994).  Concluding that Mr. Feder
failed to prove that "Evan's habitual residence in the United
States as of January 8, 1994 had changed to Australia by the time
Mrs. Feder refused to return him from Pennsylvania in the summer
of 1994[,]" the court held that "the habitual residence of
Charles Evan Feder is in the United States and that his mother
has not wrongfully retained him here."  Id. at 868.  The court's
holding was based on the view that although "Mr. Feder may have
considered and even established Australia as his habitual
residence by June of 1994 . . ., Mrs. Feder assuredly did not[,]"
as "she never developed a settled purpose to remain [there]." Id.

---

[0]      According to the Hague International Child Abduction
Convention; Text and Legal Analysis found at Pub. Notice 957, 51
Fed. Reg. 10494 (1986), "`wrongful removal' refers to the taking
of a child from the person who was actually exercising custody of
the child.  `Wrongful retention' refers to the act of keeping the
child without consent of the person who was actually exercising
custody."  Id. at 10503.  Since Mr. Feder consented to Mrs.
Feder's removing Evan from Australia to the United States, but
did not consent to the child's being retained there, we view this
case as involving an alleged "wrongful retention".

Because of its decision regarding Evan's habitual residence, the court did not reach the merits of Mrs. Feder's claim that Evan's return to Australia would place him at risk. Id. This appeal followed.

                                II.

     The Hague Convention on the Civil Aspects of International Child Abduction reflects a universal concern about the harm done to children by parental kidnapping and a strong desire among the Contracting States to implement an effective deterrent to such behavior. Hague Convention, Preamble; 42 U.S.C. § 11601(a)(1)-(4). Both the United States and Australia are signatory nations. The United States Congress implemented the Convention in the International Child Abduction Remedies Act, 42 U.S.C. § 11601 et seq., expressly recognizing its "international character" and the "need for uniform international interpretation" of its provisions. 42 U.S.C. § 11601(b)(2), (3)(B). In Australia, the Convention was implemented by the Family Law (Child Abduction Convention) Regulations made pursuant to s 111B of the Family Law Act 1975.

     The Convention's approach to the phenomenon of international child abduction is straightforward. It is designed to restore the "factual" status quo which is unilaterally altered when a parent abducts a child and aims to protect the legal custody rights of the non-abducting parent.[0] Pub. Notice 957, 51

---

[0]      The Hague Convention on the Civil Aspects of International Child Abduction does not settle custody disputes,

9

Fed. Reg. 10494, 10505 (1986). Thus, the cornerstone of the Convention is the mandated return of the child to his or her circumstances prior to the abduction if one parent's removal of the child from or retention in a Contracting State has violated the custody rights of the other, and is, therefore, "wrongful". Hague Convention, Article 12.[0] The general rule of return, however, has exceptions. If, for example, "there is a grave risk that [a child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation[,]" return is not mandatory. Hague Convention, Article 13*b*.

Under Article 3 of the Convention, the removal or retention of a child is "wrongful" where:

*a* it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

*b* at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

---

stating that "[a] decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue." Hague Convention, Article 19.
[0] Article 12 provides that "[w]here a child has been wrongfully removed or retained in terms of Article 3 . . . the authority concerned shall order the return of the child forthwith." Hague Convention, Article 12. The Convention does not require that a child be returned to his or her habitual residence, although in the classic abduction case, this occurs. Where a prevailing party has moved from the child's habitual residence, the child is returned to that party, wherever he or she may be. Pub. Notice 957, 51 Fed. Reg. at 10511.

> The rights of custody mentioned in sub-paragraph *a* above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

Hague Convention, Article 3.

For purposes of the Convention, "`rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence[.]" Hague Convention, Article 5*a*. The conflict of laws rules as well as the internal law of the child's habitual residence apply in determining a parent's custody rights. Elisa Perez-Vera, Explanatory Report by Elisa Perez-Vera, in 3 Actes et documents de la Quatorzieme session 426, 445-46 (1982).[0] If a child's habitual residence is a State which has more than one territorial unit, the custody rights laws of the territorial unit apply. Hague Convention, Article 31.[0]

Pursuant to the International Child Abduction Remedies Act, state and federal district courts have concurrent original jurisdiction of actions arising under the Convention. 42 U.S.C. § 11603(a). Any person seeking the return of a child under the Convention may commence a civil action by filing a petition in a

---

[0]    Elisa Perez-Vera was the official Hague Conference reporter. Her Explanatory Report is recognized as the official history and commentary on the Convention. Pub. Notice 957, 51 Fed. Reg. at 10503.

[0]    In the United States, the law in force in the state in which the child was habitually resident (as possibly preempted by the International Child Abduction Remedies Act, 42 U.S.C. § 11601 et seq.) would apply to determine whether a removal or retention was wrongful. Pub. Notice 957, 51 Fed. Reg. at 10506.

11

court where the child is located. Id. § 11603(b). The petitioner bears the burden of showing by a preponderance of the evidence that the removal or retention was wrongful under Article 3; the respondent must show by clear and convincing evidence that one of Article 13's exceptions apply. Id. § 11603(e)(1)(A), (2)(A).

III.

A.

The question of Evan's habitual residence immediately prior to the retention is the threshold issue we must first address.[0] The Hague Convention on the Civil Aspects of International Child Abduction does not provide a definition for habitual residence; case law analyzing the term is now developing. We are not, however, without guidance; the Court of Appeals for the Sixth Circuit and the High Court of Justice of the United Kingdom have considered the meaning of "habitual residence" in a Hague Convention case.

In Friedrich v. Friedrich, 983 F.2d 1396 (6th Cir. 1993), a German father filed a petition for the return of his

---

[0] Unlike the dissent, we believe that the determination of habitual residence is not purely factual, but requires the application of a legal standard, which defines the concept of habitual residence, to historical and narrative facts. It is, therefore, a conclusion of law or at least a determination of a mixed question of law and fact. Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 102-03 (3d Cir. 1981). On such questions we employ a mixed standard of review, accepting the district court's historical or narrative facts unless they are clearly erroneous, but exercising plenary review of the court's choice of and interpretation of legal precepts and its application of those precepts to the facts. Id.

12

son, Thomas, alleging that Thomas' mother, a citizen of the United States and a member of the United States Army stationed in Bad Aibling, Germany, had wrongfully removed the child from Germany, where the family lived, to Ironton, Ohio. A few days before Mrs. Friedrich left Germany with Thomas, Mr. Friedrich had forced his wife and child from the family's apartment and Mrs. Friedrich had assumed the role of Thomas' primary caretaker. Emphasizing her caretaking role and intentions to return eventually to the United States with Thomas, Mrs. Friedrich argued that Thomas' habitual residence had shifted from Germany to the United States. The court, however, held that Germany was Thomas' habitual residence. Focusing on the child, "look[ing] back in time, not forward[,]" and finding any future intentions that Mrs. Friedrich had harbored for Thomas to reside in the United States irrelevant to its inquiry, the court concluded that Thomas' habitual residence could be "`altered' only by a change in geography [which must occur before the questionable removal] and the passage of time, not by changes in parental affection and responsibility." Id. at 1401–02.[0]

In Re Bates, No. CA 122–89, High Court of Justice, Family Div'l Ct. Royal Courts of Justice, United Kingdom (1989), a mother petitioned the court under the Convention for the return

---

[0] Having determined that Germany was Thomas' habitual residence, the Court of Appeals remanded the case to the district court with instructions to determine whether any of Mr. Friedrich's actions had terminated his custody rights under German law and whether any of the exceptions to the Hague Convention on the Civil Aspects of International Child Abduction general rule of return applied. Friedrich v. Friedrich, 983 F.2d 1396, 1403 (6th Cir. 1993).

13

of her child, Tatjana, asserting that Tatjana had been wrongfully removed from New York to London by the child's nanny at the father's request.  The father, born and raised in England, was a successful musician who enjoyed international fame; the mother was a United States citizen who shared her husband's life of world-wide public engagements, rehearsals and recording sessions. The father owned a home in London which served as the family's "base".  In the early part of 1989, the father's band was about to embark on a tour, starting with the United States, going next to the Far East, and ending with a stay of indefinite duration in London.  The parents rented or borrowed a friend's New York apartment, having decided that Tatjana and her mother would live in New York while the father was on tour.  Because Tatjana's speech skills were deficient for a two-and-a-half year old child, the mother consulted a New York speech therapist with whom she discussed arrangements for therapy sessions for Tatjana during their stay.  Toward the end of January, 1989, the family moved into the New York apartment.  After accompanying the father on various engagements in British Columbia and the United States during the first week of February, 1989, Tatjana, her mother and her nanny returned to New York, even though her father only reluctantly agreed to that course, preferring to have Tatjana return with the nanny to the London home.  Two days after the father's departure for the Far East, Tatjana's nanny telephoned him to report a heated argument with Tatjana's mother.  The father authorized the nanny to take Tatjana immediately to England, which she did.

14

In her petition, the mother alleged that Tatjana's habitual residence was New York and that her rights of parental guardianship under New York law had been breached by the child's removal. In deciding the question of habitual residence, the court initially observed that the concept is fluid, fact-infused and largely free from technical rules and presumptions, id. slip op. at 9,[0] and recognized that although "[t]he residence whose habituality has to be established is that of the child[,] [i]n the case of a child as young as Tatjana, the conduct and the overtly stated intentions and agreements of the parents during the period preceding the act of abduction are bound to be important factors and it would be unrealistic to exclude them". Id. slip op. at 10.

In its opinion, the court set forth a governing principle for ascertaining the elements of habitual residence, which we find instructive:

> [T]here must be a degree of settled purpose. The purpose may be one or there may be several. It may be specific or general. All that the law requires is that there is a settled purpose. That is not to say that the propositus intends to stay where he is indefinitely. Indeed his purpose while settled may be for a limited period. Education, business or profession, employment, health, family or merely love of

---

[0] In Rydder v. Rydder, 49 F.3d 369 (8th Cir. 1995), a case arising under the Convention, the Court of Appeals for the Eighth Circuit was guided by this observation from Re Bates, No. CA 122-89, High Court of Justice, Family Div'l Ct. Royal Courts of Justice, United Kingdom (1989), in affirming the district court's treatment of the children's Swedish residence registration as a legal fiction of little consequence to the determination of their habitual residence. Rydder, 49 F.3d at 373.

15

the place spring to mind as common reasons
for a choice of regular abode, and there may
well be many others.  All that is necessary
is that the purpose of living where one does
has a sufficient degree of continuity to be
properly described as settled.

Id. (citation omitted).

Applying this principle to the facts, the court

concluded that because New York had acquired a "sufficient degree

of continuity to enable it properly to be described as

settled[,]" it was Tatjana's habitual residence within the

meaning of Article 3 of the Convention:

The New York plan had acquired a more settled
purpose by the time that the parties were in
Seattle and Vancouver in the first few days
of February, and the father's departure on
his Far East tour was immediately imminent.
New York had by then become the city in which
the mother wanted to stay and in which the
father had reluctantly agreed to allow her to
stay with Tatjana, at least until the band
returned to London in April 1989.  The extent
to which New York would feature in their
lives thereafter would depend very much on
the decision which the parents then made
about their personal lives . . . .

. . . I am satisfied that the arrangements
that had been agreed, however acrimoniously,
before the abduction date between the two
parents for Tatjana's care, accommodation and
therapy treatment in New York during the
period of three months or so that would be
due to elapse before the father's return to
London amounted to a purpose with a
sufficient degree of continuity to enable it
properly to be described as settled.

Id. slip op. at 9-10.[0]

---

[0] The court then determined that the mother's rights of
parental guardianship under New York law had been breached and
that Tatjana's return would not expose her to a grave risk of

16

Guided by the aims and spirit of the Convention and assisted by the tenets enunciated in Friedrich v. Friedrich and Re Bates, we believe that a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a "degree of settled purpose" from the child's perspective. We further believe that a determination of whether any particular place satisfies this standard must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there.

When we apply our definition of habitual residence to the facts, we conclude that Australia was Evan's habitual residence immediately prior to his retention in the United States by Mrs. Feder. Evan moved, with his mother and father, from Pennsylvania to Australia where he was to live for at the very least the foreseeable future, and stayed in Australia for close to six months, a significant period of time for a four-year old child. In Australia, Evan attended preschool and was enrolled in kindergarten for the upcoming year, participating in one of the most central activities in a child's life. Although Mr. and Mrs. Feder viewed Australia very differently, both agreed to move to that country and live there with one another and their son, and did what parents intent on making a new home for themselves and

---

physical or psychological harm, as the father asserted. Accordingly, the court granted the mother's petition. Re Bates, No. CA 122-89, slip op. at 11.

17

their child do -- they purchased and renovated a house, pursued interests and employment, and arranged for Evan's immediate and long-term schooling.  That Mrs. Feder did not intend to remain in Australia permanently and believed that she would leave if her marriage did not improve does not void the couple's settled purpose to live as a family in the place where Mr. Feder had found work.

We thus disagree with the district court's conclusion that the United States, not Australia, was Evan's habitual residence and with its analysis of the issue in several respects. In rejecting Australia, the court placed undue emphasis on the fact that the majority of Evan's years had been spent in the United States, ignoring the approximately six months that Evan lived in Australia immediately preceding his return to the United States and the circumstances of his life in Australia.  Moreover, the court disregarded the present, shared intentions of both Mr. and Mrs. Feder with regard to Evan's stay in Australia, focusing instead on Mrs. Feder exclusively and on the facts which indicated that she did not intend to remain in Australia if her marriage ended at some future date.[0]  Finally, we find the court's reliance on In re Ponath, 829 F. Supp. 363 (D. Utah 1983), where the court found that a child was habitually resident in the United States as alleged by the respondent-mother, not in

---

[0]    For essentially the same reasons, we disagree with the dissent's view that the United States was Evan's habitual residence immediately prior to the retention.  As the country of Evan's relatively distant past and Mrs. Feder's unilaterally chosen future, it does not coincide with our understanding of habitual residence nor satisfy the definition we have enunciated.

18

Germany as alleged by the petitioner-father, misplaced.  There, what began as a voluntary visit to the father's family in Germany by the mother and child, both of whom resided in the United States, turned into "coerced residence" by virtue of the verbal, emotional and physical abuse that the father successfully used to prevent his wife's and child's return to the United States.  Id. at 368.  Such is clearly not the case here.

We thus hold that Evan was habitually resident in Australia immediately prior to his retention by Mrs. Feder in the United States.


B.

Our analysis, however, does not end here.  Having concluded that Evan was a habitual resident of Australia, we must now determine whether his retention by Mrs. Feder was wrongful under Article 3 of the Convention.  This determination involves two inquiries:  whether the custody rights Mr. Feder enjoyed under Australian law were breached by the retention and whether Mr. Feder was exercising those rights at the time.[0]

With regard to Mr. Feder's custody rights under Australian law, we recall that the Convention calls into play a State's choice of law rules as well as its internal custody rights laws.  See supra p. 11.  We must, therefore, initially determine what law Australia would apply in this case.  Among the

_____

[0]       We may decide both of these questions since the first is a question of law and the second involves an admission on Mrs. Feder's part.  See infra pp. 22-23.

19

documents included in the minutes of the discussions of the Fourteenth Session of The Hague Conference are a "Questionnaire on international child abduction by one parent", and the "Replies of the Governments to the Questionnaire". 3 Actes et documents de la Quatorzieme session 9, 9-11, 61, 61-129 (1982) ["Convention Documents"]. Australia's reply to questions 17 and 18, which ask respectively "[w]hat are your choice-of-law rules in child custody cases?" and "[a]re there any norms of constitutional or other fundamental law in your country which would override the usual choice-of-law rules in custody cases?", Convention Documents at 11, provides in pertinent part that Australian courts apply Australia's Family Law Act 1975 to custody questions:

> Under the Family Law Act [1975], if the court has jurisdiction[0] to hear an application for custody of, or access to, a child . . . it applies the provisions of the Act governing the determination of custody and access applications regardless of the nationality or place of domicile or habitual residence of the child.

Convention Documents at 65. See also PETER E. NYGH, CONFLICT OF LAWS IN AUSTRALIA, Ch. 27 (5th ed. 1991).

---

[0] In reply to question 9 of the "Questionnaire on international child abduction by one parent", "[w]hat bases do your courts use for assuming jurisdiction in child custody cases?", 3 Actes et documents de la Quatorzieme session 9, 10 (1982) ["Convention Documents"], Australia stated that under the Family Law Act 1975, such proceedings may be instituted if either party to the marriage is an Australian citizen or either party to, or the child of, the marriage is present in Australia. Convention Documents at 64.

Thus, Mr. Feder's custody rights are determined by Australia's Family Law Act 1975, of which we may "take notice directly . . . without recourse to the specific procedures for the proof of that law. . . ." Hague Convention, Article 14.[0] Under the Act, in the absence of any orders of court, each parent is a joint guardian and a joint custodian of the child,[0] and guardianship and custody rights involve essentially the right to have and make decisions concerning daily care and control of the child.[0] Family Law Act 1975 s 63(E)(1)-(2), (F)(1). See also Hague Convention, Article 5*a*.

---

[0] We observe that the Australian court to which Mr. Feder made application for declarations under the Hague Convention applied Australia's Family Law Act 1975 to determine whether Mrs. Feder's retention of Evan was wrongful. See supra p. 7. The court's opinion, however, does not indicate whether a conflict of laws analysis was done.

[0] Section 63(F)(1) states:

> Subject to any order of a court for the time being in force (whether or not made under this Act and whether made before or after the commencement of this section) each of the parents of a child who has not attained 18 years of age is a guardian of the child and the parents have the joint custody of the child.

Family Law Act 1975 s 63(F)(1).

[0] Subsections 63E(1) and (2) provide:

> **63E(1) [Guardianship of child]** A person who is the guardian of a child under this Act has responsibility for the long-term welfare of the child and has, in relation to the child, all the powers, rights and duties that are, apart from this Act, vested by law or custom in the guardian of a child, other than:
>
> (a) the right to have the daily care and control of the child; and

Turning next to the Convention's requirement that Mr. Feder was actually exercising the custody rights he had at the time of the retention, Hague Convention, Article 3*b*, we observe that Mrs. Feder conceded both in the district court and before us on appeal that Mr. Feder had and was exercising joint custody with respect to decisions concerning their son. Accordingly, we hold that Mrs. Feder's unilateral decision to retain Evan in the United States was wrongful within the meaning of Article 3 of the Convention.

IV.

As we recognized, there are exceptions to the Hague Convention on the Civil Aspects of International Child Abduction general rule that a child's return is mandatory where he or she has been wrongfully retained by a parent. Hague Convention, Article 13. Here, Mrs. Feder raised one of the exceptions, asserting that Evan's return would expose him to a grave risk of

---

(b) the right and responsibility to make decisions concerning the daily care and control of the child.

**63E(2) [Custody of child]** A person who has or is granted custody of a child under this Act has:

(a) the right to have daily care and control of the child; and

(b) the right and responsibility to make decisions concerning the daily care and control of the child.

Family Law Act 1975 s 63(E)(1), (2).

22

psychological or physical harm or otherwise place him in an intolerable situation. Hague Convention, Article 13*b*. In light of its conclusion that Mr. Feder failed to satisfy his burden of proof on the threshold question, the district court did not reach this issue.

This case, therefore, must be remanded for the district court to consider in the first instance whether as the International Child Abduction Remedies Act requires, Mrs. Feder can establish the exception by clear and convincing evidence. 42 U.S.C. § 11603(b). We note that the exceptions are narrowly drawn, lest their application undermines the express purposes of the Convention. Indeed, the courts retain the discretion to order return even if one of the exceptions is proven. Pub. Notice 957, 51 Fed. Reg. 10494, 10509 (1986). If needed, the district court should supplement the record on this issue, and as it so appropriately did before, render its decision as expeditiously as is possible since time is of the essence given Evan's young age.

We also note that in order to ameliorate any short-term harm to the child, courts in the appropriate circumstances have made return contingent upon "undertakings" from the petitioning parent. Thomson v. Thomson, 119 D.L.R.4th 253 (Can. Sup. 1994). The district court, on its own initiative, heard testimony about the undertakings Mr. Feder was willing to make in the event that Evan returned to Australia and was not accompanied by Mrs. Feder. Given its denial of Mr. Feder's petition, however, the court did not assess the need for or the adequacy of those undertakings. If

on remand the court decides that Evan's return is in order, but determines that Mrs. Feder has shown that an unqualified return order would be detrimental to Evan, the court should investigate the adequacy of the undertakings from Mr. Feder to ensure that Evan does not suffer short-term harm. See Re O, 2 FLR 349 (U.K. Fam. 1994) (exacting appropriate undertakings is legitimate in Convention cases).

Finally, Mr. Feder has requested fees and costs. Section 11607(b)(3) of the International Child Abduction Remedies Act requires any court ordering the return of a child under the Convention to award fees and costs to the petitioner unless the respondent establishes that such order would be "clearly inappropriate". 42 U.S.C. § 11607(b)(3). In the event that Mr. Feder ultimately prevails on remand, the district court should also consider and decide this issue.

V.

For the foregoing reasons, we will vacate the district court's denial of Mr. Feder's petition and remand the case to the district court for further proceedings on the exception raised by Mrs. Feder and if necessary, on the questions of undertakings by Mr. Feder and his request for an award of fees and costs.

24

SAROKIN, Circuit Judge, dissenting.

I respectfully dissent, not necessarily because I disagree with the majority's analysis of the facts, but rather with the standard by which these facts are reviewed. The issue presented to the district court was the determination of a four year-old boy's "habitual residence," either Jenkintown, Pennsylvania, where he has lived almost his entire life and where his mother now resides, or Sydney, Australia, where he stayed for five months in 1994 and his father now resides. Resolution of this issue determines where the child shall reside pending conclusion of his parents' custody dispute.

The district court held an evidentiary hearing and ruled that the boy was habitually resident in Jenkintown. The majority subjects this determination to plenary review and vacates the order of the district court, which likely will result in an order that the child be sent to Sydney where his father lives. Although the majority's opinion does not and is not meant to resolve the ultimate issue of custody, it has immediate impact on the child's place of residence, and ultimately and realistically it will impact upon the final custody determination. Where a child resides and develops ties awaiting a final decision on custody invariably affects that decision. Therefore, we should disturb the existing relationship and a finding of habitual residency, even on a temporary basis, with

great hesitancy and only when the facts and law clearly mandate it.

In my view the issue of habitual residence is essentially a factual one, and the findings of the district court should not be disturbed unless they are clearly erroneous. Because I respectfully believe that the majority has established an incorrect standard of review, and because I would affirm the district court's finding as supported by the evidence and not clearly erroneous, I dissent.

## I.

The U.S. Senate ratified the 1980 Hague Convention on Civil Aspects of International Child Abduction ("the Convention") and enacted supplementary implementing legislation, the International Child Abduction Remedies Act of 1988, 42 U.S.C.A. §11601 et seq. (West 1995) ("ICARA" or "the Act"), only recently, and thus reported cases pursuant to the Convention are relatively scarce. Although three appellate decisions have reviewed ICARA petitions disposed of after an evidentiary hearing, none has enunciated an explicit standard of review. See Prevot v. Prevot (In re Prevot), ___ F.3d ___, 1995 WL 413694 (6th Cir. July 14, 1995); Rydder v. Rydder, 49 F.3d 369 (8th Cir. 1995); Friedrich v. Friedrich, 983 F.2d 1396 (6th Cir. 1993). Hence, ours is the first court of appeals in the nation to analyze the appropriate standard of review for determinations of "habitual residence," and we must tread carefully because of its immediate effect upon the residency of the child involved.

26

In a footnote, the majority announces that because the determination of habitual residence is a mixed question of fact and law, historical or narrative facts will be reviewed for clear error and the "choice and interpretation of legal precepts and its application of those precepts to the facts" will be subjected to plenary review. Maj. Op. at ___, n.9 [typescript at 12, n.9]. This is certainly the proper standard for mixed questions of law and fact, but I cannot agree that "habitual residence" presents such a question.

Preliminarily, I remark that federal and state courts[0] have struggled over this precise issue, with some making findings of fact and others conclusions of law regarding a child's habitual residence. Compare Wanninger v. Wanninger, 850 F.Supp. 78, 81 (D.Mass. 1994) ("the court finds that the children were 'habitually resident' in Germany"); Meredith v. Meredith, 759 F.Supp. 1432, 1436 (D.Ariz. 1991) (habitual residence is finding of fact); David B. v. Helen O., 625 N.Y.S.2d 436, 438 ("the court's finding with respect to the habitual residence issue is dispositive") & 441 n. 3 (Fam.Ct. 1995); Roszkowski v. Roszkowska, 644 A.2d 1150, 1157, 274 N.J.Super. 620, 634 (Ch.Div. 1993); Cohen v. Cohen, 158 Misc.2d 1018, 1024, 602 N.Y.S.2d 994, 998 (Sup.Ct. 1993) (habitual residence is "factual determination"); with Prevot v. Prevot (In re Prevot), 855 F.Supp. 915, 920 (W.D.Tenn. 1994) (habitual residence is conclusion of law), rev'd on other grounds, ___ F.3d ___, 1995 WL

_____

[0]Under the Act, state and federal courts have concurrent jurisdiction over ICARA petitions. 42 U.S.C.A. §11603(a).

413694 (6th Cir. July 14, 1995); In re Ponath, 829 F.Supp. 363, 367 (D.Utah 1993); Slagenweit v. Slagenweit, 841 F.Supp. 264, 269 (N.D.Iowa 1993), appeal dismissed without op., 43 F.3d 1476 (8th Cir. 1994); Falls v. Downie, 871 F.Supp. 100, 102 (D.Mass. 1994). Encompassing all, the district court here wrote that it "finds and concludes that the habitual residence of Charles Evan Feder is in the United States." Feder v. Evans–Feder, 866 F.Supp. 860, 868 (E.D.Pa. 1994) (emphasis added).[0]

First, "habitual residence" is not defined in either the Convention or the Act, and consequently one must look to the legislative and negotiating history. Unfortunately, neither the legislative history of the Act nor the U.S. Department of State legal analysis submitted to the Senate by President Reagan during ratification reveal the proper standard of review. See H. Report No. 525, 100th Cong., 2d Sess., 1988 U.S.C.C.A.N. 386, 392–96; U.S. Department of State, Legal Analysis, Hague International Child Abduction Convention ("Legal Analysis"), 51 Fed.Reg. at 10504.

The term is discussed in one document, however, that reveals its meaning to the Convention. According to the U.S. Department of State, the report by the official Hague Conference Reporter for the Convention is "recognized by the Conference as the official history and commentary on the Convention." Legal

---

[0] I thus think the majority errs by characterizing the district court as "concluding that the United States was Evan's 'habitual residence.'" Maj. Op. at ___ (Typescript at __) (emphasis added).

28

Analysis, 51 Fed.Reg. at 10503.  This "official history and commentary" explains:

> 'habitual residence' . . . is, in fact, a familiar notion of the Hague Conference, where it is understood as a purely factual concept, to be differentiated especially from that of the 'domicile.'

Elisa Perez-Vera, "Report of the Special Commission," Conference de La Haye de droit international prive: Actes et documents de la Quatorzieme session, Vol. III, Child Abduction, ¶ 60 at 189 (emphasis added).  Examination of a treaty's negotiating history is appropriate where the plain language itself is unclear.  See Sale v. Haitian Ctrs. Council, ___ U.S. ___, 113 S.Ct. 2549, 2565-67 (1993).  In this regard, analysis of negotiating history is akin to consideration of legislative history in a case of statutory construction.  Accordingly, the official history's characterization of habitual residence as "a purely factual concept" is powerful evidence that its drafters intended a determination of habitual residence to be one of fact, not of law.

Second, the jurisprudence of habitual residence has generally reflected the fact-bound nature of the inquiry.  The Sixth and Eighth Circuits have approved a British construction of the term:

> It is greatly to be hoped that the courts will resist the temptation to develop detailed and restrictive rules as to habitual residence, which might make it as technical a term of art as common law domicile.  The facts and circumstances of each case should continue to be assessed without resort to presumptions or pre-suppositions.

In re Bates, No. CA 122-89, slip op., High Court of Justice, Family Div'n Ct. Royal Courts of Justice, United Kingdom (1989),

at 9 (quoting Dicey and Morris, The Conflict of Laws, at 166); Rydder, 49 F.3d at 373; Friedrich, 983 F.2d at 1401. See also Ponath, 829 F.Supp. at 365. "The intent is for the concept [habitual residence] to remain fluid and fact based, without becoming rigid." Levesque v. Levesque, 816 F.Supp. 662, 666 (D.Kan. 1993). Even the Bates decision, treated by the majority as authoritative, referred to a "finding of wrongful removal," Bates, slip op. at 9, which of course depends on a determination of habitual residence. Such descriptions are consistent with my conviction that habitual residence is a factual finding.

Third, very recently the Sixth Circuit has characterized the question of whether a parent is exercising his or her custodial rights as a "finding." Prevot, ___ F.3d at ___, 1995 WL 413694, *11 n. 4. The actual exercise of custodial rights, like "habitual residence," is an element of a petitioner's proof that a removal or retention was "wrongful." See Convention, Article 3; 42 U.S.C.A. §11603(e)(1). I agree with the Sixth Circuit and perceive absolutely no reason to treat a determination of habitual residence, as required in Article 3(a), as a legal conclusion, but that of the actual exercise of custodial rights, as required in Article 3(b), as a factual finding.

Fourth, the Act's use of the phrase "establish by a preponderance of the evidence" to describe a petitioner's burden of proving wrongful removal from a place of habitual residence signals that habitual residence is a fact question. 42 U.S.C.A. §11603(e)(1).

30

Finally, the majority's treatment of habitual residence confuses "ultimate facts" with "mixed questions of fact and law." While an ultimate fact may depend on subsidiary findings of fact, it is nonetheless a factual finding and must be reviewed for clear error. Pullman-Standard, Div. of Pullman, Inc. v. Swint, 456 U.S. 273, 287 (1982). For example, the following determinations have been characterized as "ultimate facts" and reviewed for clear error: intentional discrimination, Pullman-Standard, 456 U.S. at 287; "more than minimal planning," United States v. Cianscewski, 894 F.2d 74, 83 (3d Cir. 1990); "equivalence" in a patent dispute, Interdynamics, Inc. v. Wolf, 698 F.2d 157, 176 n.36 (3d Cir. 1982); and "a bankruptcy court's ultimate finding of fact," Bittner v. Borne Chemical Co, 691 F.2d 134, 138 (3d Cir. 1982). To scrutinize ultimate facts by a standard less deferential than that of clear error is "untenable," American Home Products Corp. v. Barr Laboratories, Inc., 834 F.2d 368, 371 (3d Cir. 1987), and to the extent our circuit once reviewed ultimate facts in part for legal mistake, "we were wrong." Martin v. Cooper Electric Supply Co., 940 F.2d 896, 908 n.11 (3d Cir. 1991), cert. denied, 503 U.S. 936 (1992). Indeed, if the question of Evan's habitual residence had been submitted to a jury rather than a judge, I would doubt that we would set aside the same decision on the grounds that it was mandated as a matter of law.

Accordingly, I conclude that the determination of a child's habitual residence is best described as a factual finding. I would review the district court's ruling on Evan's

31

habitual residence for clear error, see Fed.R.Civ.P. 52(a), and I would not disturb it unless left with the definite and firm conviction that a mistake had been committed.  Oberti v. Board of Educ., 995 F.2d 1204, 1220 (3d Cir. 1993).  Even if I "might have come to different factual conclusions based on this record, [I] defer to the findings of the district court unless [I am] convinced that the record cannot support those findings."  Id.

                            III.

        I agree with the majority opinion that "a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective."  Maj. Op. at ___ [typescript at 17].  Yet, "the desires and actions of the parents cannot be ignored by the court in making that determination when the child was at the time of removal or retention an infant."  Ponath, 829 F.Supp. at 367.  Having reviewed the findings of the district court, however, I am not left with a "definite and firm conviction" that a mistake has been committed.  Oberti, 995 F.2d at 1220.  Therefore, I would affirm.

        I believe the habitual residence determination requires a weighing of those facts which indicate a settled purpose to reside in one location or another, as well as those which suggest close ties to a particular community.  As of January 8, 1994, the parties agreed that the scales tipped decisively in favor of Jenkintown as Evan's habitual residence.  Maj. Op. at ___

                            32

[typescript at 8]; Feder, 866 F.Supp. at 865. Yet as of this date, a number of the facts relied on by the majority had already been placed on the Sydney side of the balance. As of that date: (a) Mr. Feder had a settled purpose to live in Australia; (b) Mrs. Feder had agreed to go to Australia, with Evan but "without any commitment to remain there," Feder, 866 F.Supp. at 863; (c) Mr. Feder had purchased a home in Australia for the family; (d) the couple had put their Jenkintown home on the market; (e) the couple had sold many of their household possessions in Pennsylvania; and (f) Mrs. Feder and Evan had temporary immigration status to reside in Australia. Nonetheless, the parties agreed that these factors, alone or in sum, did not make Australia Evan's habitual residence, absent some dispositive subsequent conduct.

The question thus becomes, what if anything occurred in the subsequent five and one-half months sufficient to alter the balance? The district court carefully canvassed the evidence introduced at the hearing and determined that it was insufficient to alter the balance that existed before Mrs. Feder and Evan traveled to Sydney. The court observed that Mrs. Feder had obtained one day of employment, a single performance with the Sydney Opera, scheduled for thirteen months after her arrival; Evan attended pre-school part-time, enrolled in kindergarten for the upcoming year, and was placed on a waiting list for a private school; and Mrs. Feder and Evan had obtained Australian Medicare cards. Feder, 866 F.Supp. at 864. On the other hand, unlike her husband, Mrs. Feder declined to surrender her Pennsylvania

33

driver's license or to obtain an Australian one. Nor did she or Evan submit to the physical examination necessary to acquire permanent immigration status in Sydney, or sign any papers in support of the application Mr. Feder filed on their behalf. Id. These events, all comparatively trivial, do not persuade me that the district court committed clear error. Rather, they seem to confirm that Mr. Feder always had a settled purpose to reside in Sydney, but Mrs. Feder arrived without a settled purpose to remain, and departed never having developed one. Nor do these events indicate anything about Evan's own intentions.

I agree with the majority that there is a temporal element to this inquiry. For example, two weeks in Australia certainly would not suffice for Evan to establish a habitual residence there, and after two years his mother would have been hard put to argue that Jenkintown remained his home. Moreover, given that "habitual residence" should not be over-encumbered with legal rules, I would not establish a bright-line time period necessary to establish residence. Yet I cannot conclude that five and one-half months is so obviously sufficient that I would reverse the district court's finding as clearly erroneous. In this regard, I note that Article 12 of the Convention directs that even when a child has been wrongfully removed from his habitual residence, if the child has spent a year (prior to the filing of the petition) in a new location, return may be thwarted by a demonstration that the child "is now settled." Thus in another context, the Convention recognizes that at least one year

must pass before a child can be sufficiently "settled" so as to affect the location where custody will be adjudicated.

In addition, as of the date of the alleged wrongful removal, Evan had lived far longer in Jenkintown than in Sydney. While it may be that Mr. Feder had, and Mrs. Feder did not have, a settled purpose to reside in Sydney, it is significant that Evan stayed with his mother in Jenkintown until she left, travelling to Sydney only when she did. This indicates some correspondence between the purposes of mother and child. While it is virtually impossible to ascertain the settled purpose of such a young child, it is more closely aligned here to that of the mother. That is not meant to indicate that the mother's purpose should necessarily predominate, but rather that the facts of this matter support that conclusion.

Finally, we must be mindful of the consequence of a reversal here, since it will likely result in an order for the child's return to Australia, unless Mrs. Feder can prove by clear and convincing evidence that Evan would be at "grave risk" were he returned to Sydney. Absent such proof, the child will be taken from his mother's home in Jenkintown, where he has spent virtually all of his years, in contrast to the time spent with his father in Australia. Since this ruling is temporary pending a custody adjudication, he may again be ordered back to the United States. Although the best interests of the child will be determined ultimately, they should not be ignored in these preliminary proceedings. Such tugging and shuttling can only be

35

detrimental.  Thus, absent clearly erroneous fact-finding by the district court, its ruling should remain undisturbed.

Accordingly, I would affirm the district court's finding that Evan's habitual residence is the United States.[0]

---

[0]I add a note to endorse the majority's suggestion that, in the event the district court determines a return order would pose no "grave risk" to Evan but would nonetheless be detrimental to him, the court may evaluate the adequacy of undertakings offered by Mr. Feder.  Maj. Op. at ___ [typescript at 24].  The "permissible involvement" of a court deciding a petition "extends beyond bluntly saying that there shall be a return or that there shall not.  The court can influence the outcome by making clear that without undertakings, or with only the undertakings that are offered, Art[icle] 13(b) will apply, but that further or other undertakings are a prerequisite for a child's return."  Re O, 2 FLR 349 (U.K. Fam.Div. 1994).  The district court may, for example, require Mr. Feder to pay for mother and child to fly back to Sydney, permit them to live at the former matrimonial home while he lives elsewhere, and provide them with a car and living expenses.  Id.  The district court may also need to investigate whether undertakings offered in the United States would be binding and enforceable in Australia, if their implementation is necessary to avoid "grave risk" to the child returned.  See id.