**Roy WALTON, Plaintiff,**

v.

**Charlotte Cornett WALTON, Defendant.**

**Civil Action No. 1:96–CV–225RR.**

United States District Court,
S.D. Mississippi,
Southern Division.

May 15, 1996.

Scott C. Taylor of Scruggs, Millette, Lawson, Bozeman & Dent, P.A., Pascagoula, MS, for Plaintiff.

William R. Wright, Lee Ann Rikard of Wright Law Firm, P.A., Jackson, MS, for Defendant.

## MEMORANDUM ORDER

DAN M. RUSSELL, Jr., District Judge.

This cause is before this Court on the Plaintiff's Verified Petition and Request for Writ of Habeas Corpus pursuant to the 1980 Hague Convention on the Civil Aspects of International Child Abduction ("the Convention") as implemented by the United States Congress in the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601–11610.

### Facts

Roy and Charlotte Walton met in Gulfport, Mississippi, in 1991 while both were employees of Waste Management of North America. Charlotte subsequently quit her job with Waste Management, and on June 15, 1991, the couple was married in Baldwin, Georgia.

There was one child born of this marriage, Lynley Walton, who was born on December 16, 1991, in Stockbridge, Georgia. Mrs. Walton has one child from a previous marriage, a boy, Christopher Lee Cornett, who was born December 22, 1982.

Subsequently, the family moved to Houston, Texas, where Roy was employed as a Division President with Waste Management of Texas.

According to Charlotte's testimony, Roy informed her in June 1991, prior to their marriage, that he had requested to be transferred to Australia. The request was granted in September of 1994, while they were living in Texas. Roy testified that he requested the transfer in order to better his career and to allow his family to see the world.

The parties' testimony regarding the circumstances attending the move to Australia is in dispute. Roy recalled that he and Charlotte discussed the move and made the decision to do so "jointly" with Charlotte participating in virtually every phase of the move.

He even testified that at a social gathering prior to leaving Charlotte indicated that she was looking forward to the move.

To the contrary, Charlotte testified that the couple had been experiencing marital difficulties since they lived in Georgia and that she did not want to move to Australia and did not think it was a good idea. She further testified that when she objected to the move, Roy told her that he was going and intended to take Lynley with him. In light of this, according to Charlotte's testimony, she decided to go with him.

Roy and Charlotte visited Australia briefly prior to the move and in October of 1994 the family moved. Roy went first in September, and Charlotte and the children followed in a short time after she had tied up some loose ends in the States.

The Waltons initially relocated in Penrith, New South Wales, which is near Sydney, where they resided for approximately six months. Due to Roy being transferred, in April 1995, the family moved to 10 Moyston Court, Thornlands, Brisbane, where Roy is employed as Disposal Manager at the Brisbane office of Pacific Waste Management.

While in Brisbane the family leased a house and enrolled the children in school and day-care. Both Roy and Charlotte obtained driver's licenses and operated vehicles in Australia, and according to Roy's testimony, the family went on vacations together in Australia. Also, until their personal problems worsened, the parties held a joint banking account in Australia.

Specifically regarding Lynley, the testimony was uncontroverted that she was covered by private health insurance obtained in Australia and received medical treatment from Australian physicians. It was further represented to the Court that the family attended church together in Australia and that Lynley has playmates there.

Although the specifics of their difficulties were not brought out at the hearing, it is undisputed that the marriage further deteriorated in Australia leading the parties to turn to the Australian legal system. Roy

appears to have sought legal counsel first, and then Charlotte attempted to employ her own separate counsel. Charlotte's attempt was aggravated by the fact that Roy stopped having his pay deposited in their joint account, a move which he alleges was brought on by Charlotte's overdrawing the account. No further testimony was brought out on this point; however, it is undisputed that the law firm which Charlotte attempted to retain refused to assist her due to her lack of funds.

After being denied assistance from the private firm, Charlotte testified that she sought, without success, to obtain assistance from Australian public legal services.

Regarding her financial condition, Roy testified that he would have given Charlotte money if she had asked for it and that, in fact, he offered to make an account available to her but that she declined the offer. Charlotte testified that in order to make necessary purchases she sold her car and used the proceeds. The specifics as to the time period during which she was essentially without funds were not developed at the hearing; however, it is undisputed that in order to return to the States, Charlotte sought and obtained money from her mother who resides in Gulfport, Mississippi.

Notwithstanding Charlotte's inability to obtain separate legal counsel in Australia, the couple did enter into arbitration and although Charlotte maintains that she did not seek a divorce in Australia, it is clear that the parties did begin negotiating regarding the terms of their intended separation and about custody of the children.

During the time that the parties were trying to come to an agreement as to separation and custody of the children, Roy took possession of Lynley's passport, apparently to prevent Charlotte from taking the child out of Australia. The testimony also reveals that from approximately February of 1996 forward, the parties separated within the house and that Roy and Lynley engaged in leisure activities apart from Charlotte and Chris.

During February of 1996, Charlotte withdrew both of the children from public school and day-care without informing Roy and on March 19, 1996, Roy received a call from the office of the United States Consulate in Brisbane, informing him that Charlotte was attempting to obtain a new passport for Lynley. Roy testified that he told the individual not to allow Charlotte to leave the country and informed him that the parties were in the process of mediation as suggested by the Australian family court. Roy received the call at approximately 3:00 pm and testified that even though he obtained a restraining order from the Family Court in Brisbane, he was unable to have it served upon Charlotte prior to 5:30 pm that same day, at which time she and the children departed on a flight to the States.

On March 22, 1996, Roy petitioned the Family Court of Australia at Brisbane to be awarded custody of Lynley and was awarded "interim custody of the child." Although that court was not presented with the issue of habitual residence, it nonetheless found that Lynley was "for the purposes of [that] proceeding, ... ordinarily resident in Australia."

Since arriving in the United States, Charlotte and the children have resided with Charlotte's mother in Gulfport, Mississippi; however, as she has only recently obtained employment, Charlotte depends upon welfare and food stamps.

In an attempt to obtain the return of Lynley, Roy contacted the Center for Missing and Exploited Children in Arlington, Virginia, who in turn attempted to contact Charlotte by mail to an address in Gulfport, Mississippi. According to information brought out at the hearing, the letter was sent to an incorrect address and Charlotte never received the letter of March 26.

On April 5, 1996, Charlotte filed her Petition to Establish Custody of Minor Child and Related Relief in the Chancery Court of the First Judicial District of Harrison County, Mississippi. That court issued an order granting Charlotte temporary custody of Lynley pending a final determination.

On April 15, 1996, Roy filed the subject petition in this Court and a Writ of Habeas Corpus was issued that day requiring Charlotte to appear before this Court on May, 13,

1996, to show cause why Lynley should not be returned to Australia.

In addition to the foregoing facts presented to the Court at the hearing, the evidence also established that:

(1) during the one and one-half years that the parties resided in Australia, Lynley resided with them;

(2) on two occasions while in Australia, Roy considered resigning from his job and returning to the United States; however, he only informed his employer of his thoughts on one occasion; and

(3) notwithstanding his thoughts to the contrary, Roy has decided to remain in Australia for at least the term of his current contract which expires in September, 1997.

## Discussion of the Law

The Court and the parties are in agreement that the proceedings are properly brought pursuant to terms of the 1980 Hague Convention on the Civil Aspects of International Child Abduction which treaty became effective in the United States on July 1, 1988, and which was implemented under the terms of the International Child Abduction Remedies Act set out at 42 U.S.C. §§ 11601–11610.

Neither is it subject to dispute that the terms of the Convention, specifically Article 3 thereof, dictate the issues to be decided by this Court, to wit:

> The removal or the retention of a child is to be considered wrongful where—
>
> (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for removal or retention.

The Court further notes that although the Convention terms provide for the consideration of circumstances which, if properly presented, would allow this Court to decline to return the child to his or her state of habitual residence, as the defendant/respondent herein has not raised those conditions, this Court will not herein address same.

## I. Habitual Residency

■ Notwithstanding the seeming yet misleading apparent simplicity of the task before the Court, this Court is compelled to comment upon what it is prohibited from doing: Inquiring into and considering the fitness of the parent into whose hands we must deliver a child and in this case a parent whose "State" of residence is so far removed both geographically and legally as to prohibit any oversight by this Court.

The Court does not mean to suggest that Roy Walton is an unfit parent or that Australian domestic law is inferior. What is meant is that in matters dealing with welfare of children it is both customary and desirable for the court which has taken jurisdiction of the matter and which has issued orders regarding the child's welfare to retain such jurisdiction so that in the event that circumstances present themselves indicating that a modification of the previous order is appropriate, an order may in fact be issued and enforced. Such inquiry is not allowed under the terms of the Convention and if the foregoing conditions are met by a party, unless the presiding court is the court in whose jurisdiction the prevailing party resides and in which court the matters of custody will be decided, the court will, in the event of a mistake-in-fact though not in law, be powerless to effect a remedy. This being said, this Court proceeds to act according to the terms of the Convention as guided by opinions of other courts both here and abroad.

■ The principal difficulty presented to this Court is that of deciding the "habitual residence" of the child, Lynley Walton, a child who in less than five years has resided in three states of the United States of America and in two states of Australia. Her state of longest residence appears to have been Texas, with the shortest time being spent in Mississippi. With respect to Australia, she lived in New South Wales for approximately six months and in Queensland for approximately a year. During all those periods and in all of those locations Lynley, not surprisingly, lived where she lived because that is

where her parents lived, with the exception of Mississippi where she now resides for the first time with her mother.

Against the aforestated backdrop and with only the facts as set forth previously, this Court is required to determine Lynley's "habitual residence." The task is not made any easier by the statement regarding such which is set forth in *In re Bates*, No. CA122.89 at 9–10, High Court of Justice, Fam. Div'n Ct. Royal Court of Justice, United Kingdom (1989):

> No definition of "habitual residence" has ever been included in a Hague Convention. This has been a matter of deliberate policy, the aim being to leave the notion free from technical rules, which can produce rigidity and inconsistencies as between legal systems.
>
> .      .      .      .      .
>
> It is greatly to be hoped that the courts will resist the temptation to develop detailed and restrictive rules as to habitual residence, which might make it as technical a term of art as common law domicile. The facts and circumstances of each case should continue to be assessed without resort to presumptions or pre-suppositions.

See *Friedrich v. Friedrich*, 983 F.2d 1396 (6th Cir.1993).

Although the court in *In re Bates*, in stating that "the facts and circumstances of each case should be assessed," would appear to recognize a degree of discretion to be accorded the courts in deciding the question, it is also quite clear from the case law that "the rights and wrongs of the actions of the respective parents are not before us for disposition on the merits." *Friedrich*, at 1402.

Probably the most confusing, though often quoted, statement regarding how one determines habitual residence is that penned by the *Friedrich* court, to wit: "To determine the habitual residence, the court must focus on the child, not the parents, and examine past experience, not future intentions." *Id.* at 1401. Of somewhat greater help is that court's statement that "[o]n its face, habitual residence pertains to customary residence prior to the removal. The court must look back in time, not forward." *Id.*

In an effort to defeat the seemingly inescapable conclusion, under *Friedrich*, that Queensland is the state of habitual residence, the defendant/respondent relies upon *In re Ponath*, 829 F.Supp. 363, 367 (D.Utah 1993), wherein the court, citing to *In re Bates, supra*, at 10, stated that "[t]he concept of habitual residence must, in this court's opinion, entail some element of voluntariness and purposeful design. Indeed, this notion has been characterized in other cases in terms of 'settled purpose.'"

This Court does not find the *Ponath* case to be factually close enough to the case at bar to warrant its adoption as authority for the defendant's argument. In *Ponath* the child and mother were clearly only visiting in Germany and the child had extensive connections with Carbon County, Utah, up until the time of the "visit" to Germany. In addition, it is also clear that the mother's attempt to return to the States was initially frustrated by verbal, emotional and physical abuse by her husband.

Clearly, even if we accept Mrs. Walton's statement that she did not wish to move to Australia, it cannot be seriously argued that the move was portrayed to her as a mere visit. Neither does the testimony justify a finding that Mr. Walton coerced her to stay, save possibly in the end, and then not in the way presented in *Ponath*.

In short, the evidence does not support a finding that the Waltons' life in Australia, as well as that life experienced by Lynley while in Queensland, lacked "settled purpose."

In addition to the foregoing and in light of the undisputed fact that Lynley has never, prior to her removal to Mississippi, resided in this state, this Court cannot declare Mississippi to be the state of "habitual residence." Thus it seems clear that only Texas and the State of Queensland are the only plausible alternatives. However, as no evidence is before the Court which would justify a finding that Texas qualifies as Lynley's state of habitual residence, the only legally justifiable alternative is Queensland.

Having been compelled by the law and facts to find that the state of habitual residence for Lynley was, prior to her removal

to Mississippi, Queensland, Australia, it only remains for this Court to determine whether the second prong of Article 3 of the Convention has been satisfied. More specifically, in order to finally determine whether the removal and retention of Lynley was "wrongful," the Court must determine if, under Australian law, Roy was entitled to exercise custodial rights with respect to the child.

## II. Custody Rights

■ The United States Court of Appeals for the Third Circuit, while examining a district court opinion in a similar case, set forth in *Feder v. Evans–Feder*, 63 F.3d 217, 221 (3rd Cir.1995), as follows:

The conflict of laws rules as well as the international law of the child's habitual residence apply in determining a parent's custody rights. Elisa Perez–Vera, Explanatory Report by Elisa Perez–Vera, in 3 Actes et documents de la Quatorzieme session 426, 445–446 (1982). (Footnote omitted).

The *Feder* case, as it involved a child determined to be an habitual resident of Australia whose petitioning parent asserted custodial rights under Australian law, is both instructional and relevant. Continuing, the *Feder* court set forth as follows:

We must, therefore, initially determine what law Australia would initially apply in this case. Among the documents included in the minutes of the discussions of the Fourteenth Session of The Hague Conference are a "Questionnaire on international child abduction by one parent", and the "Replies of the Governments to the Questionnaire". 3 Actes et documents de la Quatorzieme session 9, 9–11, 61, 61–129 (1982) ["Convention Documents"]. Australia's reply to questions 17 and 18, which ask respectively "[w]hat are your choice-of-law rules in child custody cases?", and "[a]re there any norms of constitutional or other fundamental law in your country which override the usual choice-of-law rules in custody cases?", Convention Documents at 11, provides in pertinent part that Australian courts apply Australia's Family Law Act 1975 to custody questions:

Under the Family Law Act [1975], if the court has jurisdiction to hear an application for custody of, or access to, a child ... it applies the provisions of the Act governing the determination of custody and access applications regardless of the nationality or place of domicile or habitual residence of the child.

Convention Documents at 65.

*Id.* at 225.

Continuing, as to that petitioner's rights, the *Feder* court further stated:

Thus, Mr. Feder's custody rights are determined by Australia's Family Law Act 1975, of which we may "take notice directly ... without recourse to the specific procedures for the proof of that law...." Hague Convention, Article 14. Under the Act, in the absence of any orders of court, each parent is a joint guardian and a joint custodian of the child, and guardianship and custody rights involve essentially the right to have and make decisions concerning daily care and control of the child. Family Law Act 1975 s 63(E)(1)–(2), (F)(1). *See also* Hague Convention, Article 5a. (Footnote omitted).

*Id.* at 225–226.

Although the testimony and exhibits establish that the orders were entered in the Family Court of Australia at Brisbane, and specifically, Order 22.3.96 on March 22, 1996, granted Mr. Walton custody of Lynley, such order was not granted prior to the child being removed from Australia by Mrs. Walton. Thus, even though neither order, both of which reference Family Law Act 1975 generally, hurt Mr. Walton's case, they are not relevant to this question.

As it cannot be seriously disputed that under the applicable law and facts before this Court Roy Walton enjoyed custodial rights as to Lynley and that he was exercising those rights up until the time that the child was removed to Mississippi, the plaintiff/petitioner has met both requirements under Article 3 of the Convention.

## III. Stipulations

At the conclusion of the hearing on the merits, the plaintiff/petitioner, upon consider-

ing the financial condition of the defendant/respondent, agreed that should this Court find for him, he would waive the requirements regarding costs and attorneys fees which would normally be imposed by the Court pursuant to the terms of 42 U.S.C. § 11607(b)(3).

The petitioner further agreed to provide Mrs. Walton with air fare to Brisbane to be used at her discretion, whether to appear to contest any proceedings regarding Lynley or otherwise. Although additional details were not made of record, it is the perception of the Court that the offer was for only one trip. Mr. Walton also agreed to pay the fees owed by Mrs. Walton to the law firm of Clayton Utz of Brisbane, Australia, in the amount of five hundred (500) Australian dollars.

### Conclusion

Based upon the law and facts properly before this Court, the Court finds that the child, Lynley Walton, was wrongfully removed and retained by her mother, Charlotte Cornett Walton, and that said child shall be returned to her state and country of habitual residence, Queensland, Australia, without delay.

In order to facilitate the Court's ruling in this matter, counsel are hereby instructed to submit a Final Judgment forthwith.

**SO ORDERED AND ADJUDGED.**