In re the Application of Britta Ann Jessica LEVESQUE, Petitioner,

v.

Dean William LEVESQUE, Respondent.

Civ. A. No. 93–4037–DES.

United States District Court, D. Kansas.

March 2, 1993.

Arvid V. Jacobson, Jacobson & Jacobson, Junction City, KS, for petitioner.

Blair A. Jones, Caffey, Kieffer & Jones, Manhattan, KS, for respondent.

## MEMORANDUM AND ORDER

SAFFELS, Senior District Judge.

This matter is before the court on a petition filed by Britta Ann Jessica Levesque pursuant to the International Child Abduction Remedies Act, 42 U.S.C. § 11601, *et seq.* ("act"), and the Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980 ("Convention"). The Convention became effective in the United States on July 1, 1988.

In a general order entered February 25, 1993, the court ordered the minor child Vallery Ashley Levesque, d/o/b 4/16/89, currently residing with the respondent Dean William Levesque ("Dean") in Geary County, Kansas, to be returned to the petitioner Britta Ann Jessica Levesque ("Britta"). The court also awarded fees and costs associated with bringing this action. The purpose of this memorandum and order is to set forth the court's reasoning behind its findings.

## FACTS

Vallery Ashley Levesque ("Vallery") was born in Schwetzingen, Germany, on April 16, 1989, and resided in Germany until May 1991. From September 1990 until May 1991, the parents were separated and Vallery lived with Britta and Britta's grandmother, still in Germany. During the time of the separation, the parties were governed by a Separation Agreement awarding them both joint custody, with residential custody to Britta. In early May 1991, Britta and Vallery moved to the United States where they stayed in Maine with Dean's sister for a short time. At the end of May 1991, Britta and Vallery joined Dean in Junction City, Kansas, the parents having reconciled their marital difficulties. Junction City was Vallery's residence until mid-April 1992 when Britta and Vallery returned to Germany.

Dean testified that Britta told him she wanted to take Vallery to Germany in April 1992 to celebrate both of their birthdays. Dean agreed under the belief they would be returning to Junction City. Britta testified that she told Dean she was leaving and planned to stay in Germany with Vallery. She stated that Dean agreed she could go back to Germany with Vallery. Whichever scenario is accurate, Britta and Vallery returned to Junction City on May 12, 1992, after approximately five weeks in Germany.

At that time, Britta stated she returned for the purpose of getting her belongings, and planned to return to Germany with Vallery to live. She testified that she discussed this with Dean and he was in agreement that Vallery should live with Britta. Apparently Dean was leaving for some kind of military maneuvers in California, and, according to Britta, requested that she stay until he returned. Thus, she was in the United States until June 20, 1992. Britta testified that when Dean returned they discussed her return to Germany and he agreed Vallery should be with Britta. In addition, Britta testified that Dean was going to file for divorce in the United States.

Dean, on the other hand, testified that his sister called him while he was in California on maneuvers and told him Britta was selling some of their furniture and her wedding rings. When Dean returned, Britta informed him she needed some time away and was going to Germany. He further testified he felt it was better for Vallery to be with her mother, but believed they would only be gone for a short time. He acknowledged they were having some marital problems, but no more than most couples experience.

Again, whichever version is the truth, Britta and Vallery returned to Germany around June 21, 1992, with Dean's permission. Both Britta and Dean agree that they had several telephone conversations regarding the possibility of him coming to visit in late June or early July. Dean did arrive in Germany in early July 1992.

The details surrounding events on July 9, 1992, are by no means clear to the court. Both parties agree Dean came over to Britta's apartment to visit Vallery. Britta testified she discovered Vallery's passport was missing and became suspicious. While Britta was on the phone, Dean took Vallery from the apartment without Britta's permission. Dean testified that he had seen Vallery only about four days out of the ten he had been in Germany, because Britta restricted his access to the child. He further testified he took Vallery because Britta told him he could never see the child again.

Within four hours of Dean taking Vallery, Britta obtained a German court order awarding her the right to determine Vallery's residency. Dean called later that evening from a friend's house in Germany and Britta told Dean of the court order. Dean stated he believed it was a restraining order. In any event, Dean knew of the existence of a German court order before he left Germany with Vallery. He testified he called the military legal department, which told him the order was of no effect if he had not been served with a copy. The order had been entered *ex parte* and Dean was not served.

Dean returned to the United States with Vallery and called Britta once he had arrived. He subsequently began divorce proceedings and obtained a temporary custody order from Geary County District Court. In September 1992, Britta filed her answer, through counsel, seeking custody of Vallery.

One other incident bears on the court's determination in this matter. On September 22, 1992, Britta signed a Marriage Settlement Agreement giving residential custody of Vallery to Dean. Dean did not sign that agreement until February 23, 1993, the day before the hearing on this case. On November 18, 1992, however, Britta, again through her attorney, revoked and rescinded the Marriage Settlement Agreement she had previously signed, and reiterated she intended to fight for custody of Vallery. The parties concur that the agreement is of no legal effect regarding custody, but Dean asserts it goes to Britta's intent regarding custody after he had removed the child from Germany. Britta testified that the only reason she signed the agreement was that Dean threatened to have her boyfriend, a U.S. Army soldier, court martialed for adultery.

Finally, this action was filed on February 17, 1993, and on February 25, 1993, the court ordered the return of the minor child to the mother.

## APPLICABLE LAW

As stated previously, the Convention on the Civil Aspects of International Child Abduction took effect in the United States on July 1, 1988. There are two objectives of the Convention:

Article 1

a. to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and

b. to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.[1]

Therefore, in actions filed under this Convention, and the act implementing the Convention, essentially the court is to ascertain which Contracting State has jurisdiction to determine the custody rights of children who have been wrongfully removed. This court is not making any custody determinations.

The Convention applies to any child who is under sixteen years of age and was "habitually resident" in a Contracting State immediately preceding the breach of custody rights. Article 4. Specifically, the Convention provides:

Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith. Article 12.

Article 3 states that removal of a child is wrongful if it breaches the custody rights of any person, even joint custody, under the law of the State in which the child is a habitual resident immediately prior to the wrongful removal or retention and, that person was actually exercising his/her custody rights, or would have been but for the wrongful removal or retention.

In an official commentary, the Convention reporter[2] Elisa Perez–Vera states:

Now, from the Convention's standpoint, the removal of a child by one of the joint holders without the consent of the other, is wrongful, and this wrongfulness derives in this particular case, not from some action in breach of a particular law, but from the fact that such action has disregarded the rights of the other parent which are also protected by law, and has interfered with their normal exercise. The Convention's true nature is revealed most clearly in these situations: it is not concerned with establishing the person to whom custody of the child will belong at some point in the future, nor with the situations in which it may prove necessary to modify a decision awarding joint custody on the basis of facts which have subsequently changed. It seeks, more simply, to prevent a later deci-

1. Germany is also a Contracting State.

2. The Explanatory Report by Official Convention Reporter Professor Elisa Perez–Vera published in *Acts and Documents of the Fourteenth Session* Book III (1980) ("Perez–Vera Report"), is recog-

nized as the official commentary of the Convention. *Public Notice 957, Hague International Child Abduction Convention; Text and Legal Analysis by the Department of State,* 51 Fed.Reg. 10493, 10503 (1986).

sion on the matter being influenced by a change of circumstances brought about through unilateral action by one of the parties.

Perez–Vera Report at 447–448 (quoted by 51 Fed.Reg. 10493, 10506).

The court, even upon a finding that the Convention applies to the facts of the individual case, is not obligated to return the child if the person having the care of the child was not exercising his/her custody rights at the time of the removal or retention, or had acquiesced in the removal or retention. Article 13.

The issues in the current case are: 1) where was the habitual residence of the child at the time Dean took her to the United States from Germany; 2) was the child wrongfully removed; and 3) did Britta acquiesce in Dean's retention of the child in the United States.

Pursuant to 42 U.S.C. § 11603, this court has concurrent jurisdiction with the state courts over actions brought under the Convention. The burden is on the petitioner to establish by a preponderance of the evidence that the child was wrongfully removed or retained within the meaning of the Convention. 42 U.S.C. § 11603(e)(1)(A). The respondent must prove by a preponderance of the evidence that the petitioner acquiesced in the removal or retention of the child. 42 U.S.C. § 11603(e)(2)(B).

The court made the following findings in ordering the return of Vallery to the petitioner:

1. The court has jurisdiction over this action pursuant to 42 U.S.C. § 11603.

2. The court finds that Germany is the "habitual residence" of the minor child Vallery Ashley Levesque.

3. The court further finds that Dean Levesque, the respondent in this action, wrongfully removed Vallery from the petitioner's residence in Germany.

4. In addition, the court finds that Britta Levesque did not acquiesce to custody of Vallery with the respondent. Therefore, the respondent shall return Vallery to the petitioner for her return to Germany.

5. Finally, the court finds that pursuant to 42 U.S.C. § 11607(b)(3), the respondent must pay the expenses incurred by the petitioner in obtaining the return of the child. This shall include, but may not be limited to court costs, legal fees and transportation. The court will order the parties to comply with the provisions of D.Kan. Rule 220 in seeking such costs. The court strongly urges the parties to attempt settlement of this issue.

Removal or retention of a child can be wrongful only if the removal or retention is from the habitual residence of the child. The term "habitual residence" is not defined in the act or the Convention and necessarily depends upon the facts and circumstances of each case. *Meredith v. Meredith,* 759 F.Supp. 1432, 1433 (D.Ariz.1991). In *Meredith,* the mother petitioner was a citizen of France, her husband respondent a citizen of the United States, living in Arizona. The mother took their child to France, ostensibly to visit her parents, but then notified the father she was not returning to Arizona. The mother subsequently went to England without the father's knowledge. The father regained custody of the child and the mother filed a petition pursuant to the Convention alleging the child was wrongfully removed. The court, in determining the habitual residence could not be England, reasoned:

> To equate the temporary removal and subsequent sequestration of the minor child to legal status of 'habitual residence' in another country would be to reward Petitioner for her ability to conceal the child from the Respondent, her lawful, custodial parent. The Petitioner may not benefit from such conduct.

759 F.Supp. at 1435.

The respondent contends the instant case is much like the *Meredith* case, but the court finds the case distinguishable. Even if Britta told Dean she was going away for a short time, which is disputed, Dean knew she was going in June 1992 because they were having marital problems. He did not know when Britta would return and, to the court's knowledge, Britta did not attempt to keep Dean from knowing where they were. In fact, there was telephone contact and the

parties made arrangements for Dean to come to Germany to visit. The *Meredith* court's reasoning regarding concealing the child does not apply here in an analysis that is fact intensive.

As acknowledged in *Friedrich v. Friedrich*, 983 F.2d 1396 (6th Cir.1993), very few United States cases have addressed the application of the Convention. One of the most thorough cases analyzing the term "habitual residence" is *In Re Bates*, No. CA 122/89, High Court of Justice, Family Div'n Ct., Royal Court of Justice, United Kingdom (1989). *Bates* involved a two and one-half year old child who had been removed from her mother's apartment in New York and taken by the nanny to the father's home in England. The removal was with the knowledge and approval of the father. The parents' marriage had been rocky for some time, in part due to their unusual lifestyle. Father was a rock musician who was touring almost constantly and, at the time the child was taken, was in the Far East.

Prior to the father's departure for the Far East, the mother adamantly insisted upon remaining in their New York apartment with the child and her nanny, to which the father reluctantly agreed. They had rented and spent a few days in the apartment in late January 1989. On February 2, 5, 6, and 7, the family accompanied the father on engagements in several states and Vancouver, British Columbia. The mother, nanny and the child returned to New York and the child was removed to England on February 9, 1989.

As noted by the *Bates* court, no Hague Convention has ever defined "habitual residence," although the term is frequently used in such conventions. The intent is for the concept to remain fluid and fact based, without becoming rigid. The court quotes *R. v. Barnet London Borough Council ex parte Shah* [1983] 2 A.C. 309, 314 as follows:

'... and there must be a degree of settled purpose. The purpose may be one or there may be several. It may be specific or general. All that the law requires is that there is a settled purpose. That is not to say that the propositus intends to stay where he is indefinitely. Indeed his purpose while settled may be for a limited period. Education, business or profession, employment, health, family or merely love of the place spring to mind as common reasons for a choice of regular abode, and there may well be many others. All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled.'

*In re Bates* at 10.

The *Bates* court went on to state:

I am satisfied that the arrangements that had been agreed, however acrimoniously, before the abduction date between the two parents for Tatjana's [the child] care, accommodation and therapy treatment in New York during the period of three months or so that would be due to elapse before the father's return to London amounted to a purpose with a sufficient degree of continuity to enable it properly to be described as settled.

*Id.* at 10–11.

This reasoning is particularly persuasive to this court in determining Germany is the habitual residence of the child. Assuming for the sake of this petition that Dean was misled on June 20, 1992, and believed Britta was going to return to the United States after a short time, both parents agreed that Britta would return to Germany for some period of time with Vallery. The amount of time was left open and Dean agreed Vallery should go with Britta. These arrangements had been agreed to and "amounted to a purpose with a sufficient degree of continuity to enable it properly to be described as settled." The court further finds credible Britta's testimony that in April 1992 she was returning to Germany to live and only returned in May to retrieve some belongings. Britta's actions are more consistent with her testimony than are Dean's actions with his testimony.[3]

---

**3.** The court notes that determining credibility in this case, where both parents obviously care about the child's welfare and are seeking a ruling in their favor, is a difficult task at best. At worst, it does a disservice to the parties, by tending to discredit one of the parent's testimony. The

In short, when Britta and Vallery returned to Germany in April, then finally in June 1992, there was an intent to remain, at least for a period of time which was indefinite. This was by mutual agreement. Britta was caring for Vallery as a parent cares for a child, and, under German law, both parents are obliged and entitled to take care of the minor child. BGB § 1626 (German Civil Code). The court finds that Britta was exercising her rights of custody as contemplated by Article 3 of the Convention and Dean's removal was wrongful.

 The court turns now to the question of acquiescence. As stated above, if the mother consented or subsequently acquiesced to the child's removal or retention, the court is not bound to order the return of the child. All of the exceptions which allow courts to deny return of children under the Convention are intended to be construed and applied very narrowly to effectuate the objectives of the Convention. 51 Fed.Reg. at 10509. Further, finding one of the exceptions in Article 13 applicable does not make refusal of a return order mandatory. *Id.* Even if the court finds one or more of the exceptions applicable, it may find the child should be returned. *Id.*

The court is satisfied that Britta did not acquiesce in Dean's retention of Vallery in the United States. Although Britta did sign the Marriage Settlement Agreement on September 22, 1992, purportedly giving Dean residential custody, she revoked and rescinded the agreement within two months, long before Dean signed the agreement. Britta obtained a German order within four hours of Dean wrongfully removing Vallery, which gave Britta the right to determine residential custody of the child. She filed her answer in the Geary County divorce action seeking custody of Vallery. Further, she has come in and vigorously prosecuted this action under the Convention. The court finds that Britta has expressed her intent in a number of different ways that are contrary to a finding of acquiescence.[4]

Finally, pursuant to 42 U.S.C. § 11607, Britta is entitled to her costs for obtaining return of the minor child unless such an award would be "clearly inappropriate." The court has found no cases construing this provision. No evidence presented to the court suggests that such an award would be clearly inappropriate. Therefore, the court finds such costs and fees as set forth in the court's previous order should be awarded to the petitioner. Again, however, the court strongly recommends the parties settle this issue.

The court hereby adopts the orders set forth in the February 25, 1993, order.

IT IS SO ORDERED.

---

court recognizes that each party's truth is colored by his/her perception. Unfortunately, the court must make such determinations.

4. Even if signature of the one document can be construed as acquiescence, the court is satisfied under the circumstances of this case that Vallery should be returned to Britta.