682 So.2d 617 (1996)
Aislinn QUINN, Appellant,
v.
Joel John SETTEL, Appellee.
No. 96-1582.
District Court of Appeal of Florida, Third District.
October 30, 1996.
Rehearing Denied November 27, 1996.
Frank A. Abrams, Miami, for appellant.
*618 Caruana & Langan and Susan Greenberg, Miami; Deborah Marks, North Miami, for appellee.
Before NESBITT, FLETCHER and SHEVIN, JJ.
NESBITT, Judge.
A mother appeals a final judgment on parental responsibility which establishes a plan of rotational custody. We affirm the order under review. The following facts gleaned from the final judgment and supported by the record establish the basis for the trial judge's decision.
Aislinn Quinn filed the instant action to determine parental custody. She and Joel Settel stipulated to being the biological parents of a daughter, born October 26, 1984. The parents were both students in California when the child was born. Each parent is now married. Quinn and her husband live in Florida; Settel, his wife, and the children of that marriage, live in France. Over time, a custodial arrangement evolved, was agreed upon, and was utilized effectively, with the girl spending considerable intervals with each parent. From its inception, the girl's family was never structured in the usual and common fashion. An extended family spreading over various parts of the world was created for her.
As the trial judge concluded, the parties fully shared the responsibilities and joys of bringing up the girl and took turns in being the custodial parent.
The judge specifically found:
The child not only has not been harmed by the rotating custodial agreement, but, to the contrary, the child has derived great benefits from the rotating agreement.
Although the father for years encouraged the girl's relationship with her mother, in the summer of 1995, he refused to honor his prior agreement to return the child to this country. The mother went to the Hague Court and accomplished the girl's return for that summer, with the child to be returned to Paris, and a hearing set for that September. The mother did not return to France with the child as agreed, and that action was dismissed. The father attempted to counter claim, however, but was not permitted to do so, as the Court ruled that under the articles of the Hague Convention, because the child was now located in the United States, he would have to initiate proceedings in the United States. Thereafter the father chose to submit personally to the jurisdiction of the Florida court. He filed his answer to the instant petition, and counter-petitioned to establish paternity and have himself declared the appropriate primary residential parent.
This sequence of events significantly strained the parties' previous cooperative spirit. Although for years the mother encouraged the girl's relationship with her father, after the Hague action, the mother interfered somewhat with the father/daughter relationship and with the girl's relationship with her father's family.
The trial judge found, however, that Quinn and Settel were intelligent and exhibited a high degree of civility. She concluded that they were law-abiding citizens who would continue to work for the child's best interests. She expressed her feeling that once she provided a structure for the families that enabled them to work together for the child's well-being, the plan would be followed.
The judge determined:
It is in the best interests of the minor child that this court continue to enforce the intent of the various previous agreements of the parties themselves which established shared parental responsibility and a shared custodial arrangement with a rotating custody schedule.
She observed:
The court has not made this rotating custody arrangement lightly. Such rotation may not be altered unless there is a substantial change in circumstances which has not been dealt with in this final hearing. It must be an event which occurs in the future which is not contemplated on this date. The court's intention is to give [the girl] stability and prevent an additional international custody battle in the future.
The judge went on to establish a schedule where the girl would spend eighth grade with *619 the father, ninth and tenth grade with the mother, and eleventh and twelfth grade with the father, all with visits and telephonic access encouraged.
The report of the psychologist studying the girl and the two families confirms that the trial court's decision was not an abuse of discretion. The psychologist reported her belief that both families loved the girl, and that there were no psychological or clinical reasons to recommend one parent over the other. The child herself, according to the psychologist, when asked if she had any thoughts about her custody and visitation arrangements, reported that she wanted "a few more years here with my mom to get to know her, then two to three years with my dad, then I'll go to college somewhere away from both homes so there won't be any more problems about who I live with."
As stated above, the mother appeals the rotational plan ultimately ordered. The only proper concern in a custody case is the child's best interests. Adamson v. Chavis, 672 So.2d 624 (Fla. 1st DCA 1996); Bienvenu v. Bienvenu, 380 So.2d 1164 (Fla. 3d DCA 1980). Viewed as generally detrimental to that end, split custody arrangements are strongly disfavored and not ordinarily sustained. Skirko v. Skirko, 677 So.2d 885 (Fla. 3d DCA 1996). That being said, however, the law is clear that certain particular circumstances will tend to ameliorate some of the perceived undesirable effects of such arrangements. Bienvenu, 380 So.2d at 1165 (citing age and maturity of the child and division of periods of custody which related to actual events in the child's life, such as between school and holiday periods, as factors which might make a rotational custody plan workable.)
Thus, as observed in Gerscovich v. Gerscovich, 406 So.2d 1150, 1152 (Fla. 5th DCA 1981):
Regardless of the number of adverse precedents it cannot be said that a rule of law is involved in awarding custody of ... children in rotating fashion. Rather the award is an exercise of discretion by the trial court. We are therefore bound to apply the test that if reasonable men could differ as to the appropriateness of the trial court's ruling then we are not at liberty to disturb it. Canakaris v. Canakaris, 382 So.2d 1197 (Fla.1980). We may not ask whether it is the best result; only whether it is reasonable.
In the instant case, the trial judge's actions were entirely reasonable under the circumstances. The court's decision was in accord with a plan previously implemented by the parties themselves, it was in harmony with the views of the court-appointed psychologist, and it corresponded with what the child herself had expressed as an ideal solution. Thus, we affirm the order under review.
We write additionally to address one worry raised by the mother's counsel. At oral argument he expressed grave concern that following the trial judge's decision, the court would lose jurisdiction over the matter once the child was out of the country for over six months.
A child custody proceeding properly begun in Florida remains under Florida's jurisdiction until Florida determines otherwise, unless virtually all contacts with the state clearly have been lost. Brown v. Dehnert, 672 So.2d 114 (Fla. 3d DCA 1996). Also, the Florida court retains jurisdiction under the Uniform Child Custody Jurisdiction Act (UCCJA). See Greenfield v. Greenfield, 599 So.2d 1029 (Fla. 4th DCA) review denied, 613 So.2d 4 (Fla.1992). The Federal Parental Kidnapping Prevention Act, 28 U.S.C. § 1738A, establishes another state will not modify a Florida court's custody order.
Likewise the Hague Convention specifically protects custody determinations in the international context. As stated in Journe v. Journe, 911 F.Supp. 43, 46 (D.Puerto Rico 1995):
The purpose of the Convention is "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedure to ensure their prompt return to the State of their habitual residence. See Currier v. Currier, 845 F.Supp. 916, 920 (D.N.H. 1994). To this end, the Convention sets *620 forth a carefully delineated analytical framework for the application of its provisions. In accordance with these procedures, courts within signatory countries are to determine whether the children have been wrongfully removed from their place of habitual residence, and are not to overstep the scope of their authority by delving into and attempting to resolve an underlying custody dispute. Hague Convention, Art. 19; 42 U.S.C. § 11601(b)(4). Both the United States and France are signatories to the Convention.
In 1988, Congress enacted the International Child Abduction Remedies Act (ICARA) 42 U.S.C. § 11601, to implement the Hague Convention in the United States. Any person seeking the return of a child under the Convention may commence a civil action by filing a petition in a court where the child is located. 42 U.S.C. § 11603(b). The petitioner bears the burden of showing by a preponderance of the evidence that the removal or retention was wrongful. The respondent must show by clear and convincing evidence that one of certain limited exceptions apply. Most often claimed is that the child's return would result in grave danger of psychological harm. Id. S 11603(e)(1)(A), (2)(A). See Friedrich v. Friedrich, 78 F.3d 1060, 1063-64 (6th Cir.1996); Feder v. Evans-Feder, 63 F.3d 217 (3rd Cir.1995).
Again, the Hague Convention does not permit a foreign court to determine the merits of the underlying custody claim. The foreign court is responsible only for deciding whether the child should be returned to his or her "home" state. See Julia A. Todd, The Hague Convention on the Civil Aspects of International Child Abduction: Are the Convention's Goals Being Achieved?, 2 Ind. J. Global Legal Stud. 553 (1995). Whenever all the requirements of the Hague Convention are met, a "left-behind" parent may invoke the treaty to have his or her child returned. See Susan L. Barone, International Parental Child Abduction: A Global Dilemma With Limited ReliefCan Something More Be Done?, 95 N.Y. Int'l L.Rev. 103, 104 (1995).
Thus, the mechanisms are in place to ensure compliance with such orders as the one at issue. Furthermore, the Convention anticipates that all necessary expenses incurred to secure a child's return will be shifted to the abductor, both to restore the applicant to the financial position he or she would have been in had there been no removal or retention, as well as to deter such conduct from happening in the first place. See Currier v. Currier, No. 94-99, 1994 WL 392606 (D.N.H. 1994); 42 U.S.C. § 11607(b)(3); see also Levesque v. Levesque, 816 F.Supp. 662 (D.Kan. 1993).
Accordingly, in sum, as stated above, we find no abuse of discretion in the court's decision, and we affirm the order in its entirety.