In re the Application of: Diana Gabriela Reyna **BUSTAMENTE**, Plaintiff/Petitioner,

v.

Enrique Omar **SERRANO–FIGUEROA**, Defendant/Respondent.

and

Concerning Omar Axel Serrano–Reyna, Minor Child.

No. Civ.A. 02–K–756.

United States District Court, D. Colorado.

June 24, 2002.

Deborah Eugenie Read, Greenwood Village, for Plaintiff.

Eduardo Ferszt, Lucero & Associates, Denver, CO, for Defendant.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

Mother Diana Gabriela Reyna Bustamante petitions this court for the return of her six-year-old son, Omar Axel Serrano Reyna, to Mexico under the International Child Abduction Remedies Act, 42 U.S.C. § 11601–09 ("ICARA") and the Hague Convention on International Child Abduction (the "Convention"). Mother, the legal custodian of Omar pursuant to the terms of his parents' Mexican divorce decree, claims she sent Omar to Colorado from Mexico in September 2001 to visit his father in Denver for two weeks and that Omar has been wrongfully retained in the United States since October 1, 2001, when she asked Father to return Omar to Mexico and he refused. Father, Enrique Omar Serrano–Figueroa, denies Omar came to Colorado for a visit only, and claims Mother voluntarily, knowingly, and with full consent gave Omar over to his paternal grandmother in September 2001 so she could bring Omar to live with his father in Colorado. After two days of hearing, it is clear neither characterization is apt—Mother's less than Father's.

Omar left Mexico with Mother's consent in September 2001, and whether the original purpose of his trip was a visit or for a longer term, circumstances changed. Within weeks of Omar's arrival, Mother discovered she was more than four months pregnant with another child (not Father's), called her ex-husband for help, and the two of them agreed Mother would come to Colorado, he would provide support, and she could have her baby here. From Oc-

tober 15, 2001 until her daughter's birth in February and for a few weeks thereafter, Mother lived in an apartment at Asbury Circle, Aurora, with Omar and a friend or relative of Father, at Father's expense. From the time of her arrival until some time before her daughter's birth, Mother took Omar to and from school most days and volunteered at the school on Tuesdays and Thursdays. Mother never told anyone at the school that Omar was being detained in the United States against her will or that either she, or he, would be returning to Mexico after the baby's birth.

The nature of the relationship between Mother and Father from October 2001 to March 2002 is unclear. Father was (and remains) married to a U.S. citizen throughout that time, but spent "four [or] five nights a week" at the Asbury apartment with Mother and Omar. The new wife was not involved in Omar's school, and an administrator from the school testified she assumed Father and Mother were a "married couple." Whatever the relationship, there was a major falling out between Mother and Father on March 12, 2002. That night, Father took Omar to the apartment he maintained with his wife at Joliet Circle in Aurora. The following morning, Mother left the Asbury apartment with her infant daughter, ending up in a shelter. She remained in a shelter-type situation at least through the time of the hearing on her Convention Petition in May.

Father filed in the Colorado state district court a Verified Petition for Establishment of Parental Responsibility i.e. "custody,"[1] on April 5, 2002. On April 14, 2002, Mother filed the instant Petition for

---

1. Effective February 1, 1999, the Colorado General Assembly substituted the phrase "parental responsibilities" for the terms "custody," "custodial," and "custodian," in the Uniform Dissolution of Marriage Act and related state statutes. See Colo.Sess.Laws 1998, ch. 310, at 1376–1415. See also Colo.Rev.Stat. Ann. § 14–10–103(4) (2001).

Return of Child under the Hague Convention.

Thus summarized, it is clear this is not a typical "wrongful retention" case under the Convention. Notwithstanding counsel's diligent attempts to characterize it otherwise, this is not a case where a child was sent to visit a noncustodial parent in another country for a specified period of time and then not returned when that time expired. This is not a case where a child's situation has been "unilaterally" and "forcibly altered" by the alleged wrongdoer, *see* Explanatory Report of Elisa Pérez–Vera at 230 (section entitled "The objectives of the Convention").[2] This is a case where both parents acted to change the child's situation, where the visit may have initially been for a short time but was more or less open-ended, where there were no specific plans in place for the child's return, and where the custodial parent joined the child in the other country after learning she was pregnant and remained there with him, for a period of months, without a timetable or expressed intent to return to the place of her former residence after that child was born. This is a case where immigration issues, many unique to Mexican citizens with friends and family in the United States, have come into play—the desire of many to emigrate to the United States, to have their children in the United States or otherwise to secure for themselves or their children immigration status so other family members can join them here.

More importantly, this is a case where agreements and circumstances surrounding the child's presence in the foreign country changed over time, and where it

behooves no one to recast the facts so they conform, *ex post facto*, to formulaic grounds for relief under the Convention.

Under the facts alleged by Mother, Father's "retention" of Omar in the United States follows one of two timelines: (1) Omar was to have been returned to her at the end of September 2001 such that he was being "wrongfully retained" by Father as of October 1, 2001; or (2) while Omar's presence in the United States between September 15, 2001 and March 12, 2002 was consensual, Father "wrongfully retained" the child on March 12, 2002, when he took him to his apartment on Joliet Circle and Mother left to go to a shelter. Mother's Petition fails under either scenario.

While Mother would state a *prima facie* case for Omar's return to Mexico under the first scenario, her Petition would fail because she acquiesced in the retention after October 1, 2001 within the meaning of Convention article 13a when she came to the United States, set up a household with the child, and accepted the new situation without stating or acting in any way as though it were against her will.[3] The second scenario does not support a *prima facie* case of wrongfulness in the first instance, because the six months Omar lived in the United States (five of which were, in fact, with his Mother), were sufficient to establish the United States, rather than Mexico, as his habitual residence. Accordingly, Mother's request that Omar be returned to Mexico must be DENIED.

I. *Jurisdiction.*

Jurisdiction over this Hague Convention Petition exists under 42 U.S.C. § 11603(a),

---

2. Elisa Pérez–Vera was the official Hague Conference reporter. Her Explanatory Report is recognized as the official history and commentary on the Convention and is a source of background on the meaning of its provisions. Pub. Notice 957, 51 Fed.Reg. at 10506.

3. It is unclear that the post-October 15, 2001 period could even be considered a 'retention' by Father, as child lived with Mother at the Asbury apartment Father provided her, and himself only visited the child.

providing "[t]he courts of the States and the United States shall have concurrent original jurisdiction of actions arising under the Convention."

## II. *Findings of Fact.*

Mother and Father were married on March 12, 1996, in Nogales, Sonora, Mexico. Their son, Omar Axel Serrano Reyna, was born April 27, 1996.

Mother and Father separated in October 1997; divorce papers were filed in late 1999. It is undisputed that in their divorce proceedings the parties agreed to "shared parental rights" with Mother having physical custody of the child and Father visitation rights from 3 p.m. to 9 p.m. daily and weekends. Father left for the United States in January 2000, settled in Aurora, and remarried. The divorce was final in February 2000. (Petitioner's Ex. 1.)

Both parties' extended families live in Mexicali, Baja California, Mexico. From the time of the separation in October 1997 until December 1998, Mother lived at various times in the Figueroa (Father's mother's) home and with sisters in Yuma, Arizona and California, who were helping her out "emotionally and financially." Test. of Mother (Tr. at 16.) Mother returned to Mexicali in December 1998 because her father had fallen ill. Mother began looking for work after Father died in February 1999. (*Id.*) Mother obtained work in Mexicali in August 1999. (*Id.*) The parties dispute where Mother and child lived from December 1998 forward, with Mother claiming she lived primarily in the home of her mother[4] while spending substantial time at the Figueroa (Father's mother's) home and Father claiming she lived primarily at the home of his mother, who was very involved in the care and upbringing of the child. Father returned to Mexicali in at least April 2000 and April 2001 for extended visits with Omar to celebrate the child's birthday.

During the April 2001 visit, Mother and Father arrived at a plan for Omar, who would be five years old at the time, to cross the border, without her, and travel to Colorado to see his Father. In her Trial Brief, Mother described the plan as follows:

> The parents talked about Omar visiting for a short time. Father hoped to establish papers for Omar so eventually both Mother and son could come to the United States. It appears Father was attempting a sponsorship arrangement.

(Tr.Br. at 3.) In her hearing testimony, however, Mother denied the original discussions included any mention of papers or sponsorship arrangements, and stated the plan was for a visit only—"two weeks at the most, because [the child] needed to go back to school." (Test. of Mother, Tr. at 24.) Mother testified the sponsorship plan arose only after she had traveled to Colorado to retrieve Omar in October. (Tr. at 69.) Father's testimony was that there was an "agreement" from the beginning that "the child was coming to the United States in order to have a better life here." (Tr. at 175.) "There was a mutual agreement," Father testified, "that I would try to get immigration papers for the child so he could be here legally in the United States" which, Father said, was understood could take "at least two or three years." *Id.*

While I make no specific finding as to whose version of the facts is closer to the

---

4. While it is probably not relevant to the proceedings before me, it should be noted that the person Mother refers to as 'mother,' Olga Bustamente–Castillo, is actually her biological grandmother, and at least one of the sisters she refers to in Arizona and California is actually her aunt. Ms. Bustamente–Castillo and her husband are identified on Mother's birth certificate as her 'Mother' and 'Father.' *See* Test. of Bustamente–Castillo (Tr. at 233).

truth, I find that arrangements were made, with Mother's consent, for the child to enter the United States illegally in September 2001. Mother had sent the child with his passport, birth certificate and immunization record. Father testified the specific purpose for sending the immunization record was the child could be enrolled in school. Mother denied this, saying the child is often sick and she wanted him to have his vaccination records with him in case he fell ill while visiting Father. (Tr. at 47.)[5] Whatever the circumstances, the child crossed the border, without papers, with Father's new wife at Laredo, Texas, on or about September 15, 2001. Father met them on the U.S. side of the border and the three made their way to Denver. Father enrolled Omar at Ponderosa Elementary School in Aurora, Colorado, on September 28, 2001.

Notwithstanding Mother's statement regarding the purpose and length of Omar's stay, it is undisputed that at the time of the child's departure there was no specific plan in place for his return. Mother testified she "was the person who was supposed to come up here and pick him up," (Tr. at 55) but she had made no arrangements and had no visa or other papers at the time of his departure that would have allowed her to do so legally. (Tr. at 61.)

Mother arrived in Denver on or about October 15, 2001. Again, testimony as to the circumstances surrounding Mother's decision to travel to Denver is wildly contradictory, with both parents' testimony including internal inconsistencies as to time, place and purpose. Mother's testimony on both direct and cross-examination

was particularly nonresponsive · and disjointed, however, leaving me with an overall unfavorable impression as to her credibility.

Whatever the circumstances, it is undisputed that, within a week or two of Omar's arrival in Denver, Mother learned she was pregnant and contacted Father to tell him. Mother was already well into her pregnancy, and explained the delay in discovering it was the result of a misdiagnosis by her doctor in Mexico.[6] Mother states her only purpose in contacting Father was to inform him she could not travel and could not come to Colorado to retrieve the child and therefore needed Father to bring him back to Mexicali. (Tr. at 55, 91.) When Father refused, Mother said she had "no other choice" but to come to Colorado to pick up her son. (Tr. at 25).

Once she arrived, Mother testified Father made it clear he would not allow Omar to return to Mexicali. Father began pressuring her to stay for the remainder of her pregnancy, saying the child did not want to return to Mexico, offering her a place to live with the child, financial support, and a promise to help them stay in the United States afterwards if she chose. (Tr. at 69–71, 72–73.) Mother testified she was not amenable to the idea originally (Tr. at 70), intended that her daughter be born in Mexico (Tr. at 72), and felt Father's conduct was all part of a plan from the beginning to "gain more time" with the child and prevent his return to Mexico. (*Id.* at 72.) However, because she believed Father was "an intelligent man" whose family she had always trusted (Tr. at 53),

---

5. The testimony of Ponderosa Elementary School's registration secretary, Jessica Sims, belied this contention, when she stated Omar had missed no more class days due to illness during the seven months he had been attending the school than any other child. (Tr. at 121.)

6. Mother stated her symptoms had originally been diagnosed as a sort of false pregnancy requiring surgery, but pre-surgery tests included an ultrasound that revealed a real pregnancy about four months along. (Tr. at 56.)

she agreed to stay, hoping to be able to resolve things "personally." (Tr. at 71.)

Father tells a different story, testifying Mother was "crying" and "desperate" when she told him about the pregnancy, hadn't been working, and had no expectation of support from the new baby's father. (Tr. at 179.) Father stated the proposal to have her come to the United States arose then, in that telephone conversation, and that Mother was immediately amenable. (See id. at 179–80.) Father denies Mother made any request for Omar's return during that or any other conversation between the time Omar arrived in the United States and October 15, 2001, and denies Mother's purpose in coming to Denver had anything to do with bringing Omar back to Mexicali. (Id. at 178.)

I find Mother's explanation of her purpose in coming to Denver and the circumstances surrounding her decision to stay lacking in credibility. It is undisputed that Mother came to Denver pursuant to an agreement, between the parties, that Father's wife would again travel to Laredo, cross Mother over the border illegally, and bring her here. This agreement is inconsistent with the scenario described by Mother that Father was refusing to return the child, that she was going to Denver for the sole purpose of bringing the child back to Mexico and that she had no intention of staying after she arrived.[7] Furthermore, once she was here and it became clear Father was trying to "gain time" and had

no intention of allowing Omar to leave with her, Mother said nothing to anyone. She did not report it to the authorities (Tr. at 71); she did not call the police (Tr. at 75); she did not report it to her WIC Technician;[8] and she did not report it to the child's school (Tr. at 77). Finally, Mother's assertion that she was not amenable to the proposal to stay in the United States for the remainder of her pregnancy (Tr. at 70) and that her daughter "should have been born in Mexico" (Tr. at 72) are inconsistent with the statement in her Trial Brief that Father's proposal that she "stay in the United States for the remainder of her pregnancy" was "attractive.... [because] Mother has sisters in California." (Trial Br. at p. 3.)

In any event, whatever her original intent in coming to Colorado, the fact of the matter is Mother ultimately chose to stay here at least through her pregnancy. She moved into an apartment furnished by Father, began volunteering two days a week at the child's school (Tr. at 27), received prenatal care, and settled into some sort of routine. The child resided with her and she took him to and from school most days (Tr. at 27). She never told the child's teacher or any administrator at the elementary school that Omar was being retained in Colorado against her will, or that he would be leaving school after her second child was born in February. (See Test. of Jessica Sims, Tr. at 124–25.) Father visited every day, and spent four or

---

7. If Father's purpose was to retain Omar in Denver against Mother's will, why bring her to Colorado? Why have his wife make the 1700 mile round trip from Denver to Laredo and back, and risk crossing Mother over the border illegally? And if Mother's sole purpose in coming to Denver was to retrieve Omar, why would she agree to have Father's wife come all the way to the Mexican border to cross her over and take her to Denver, when the wife in the same trip could simply have brought the child with her and saved

herself another round trip a few days later? I note Mother's grandmother corroborated Mother's statement that she left only to retrieve the child (Tr. at 59–60), but question how much the grandmother knew about Mother's plans given that Mother didn't even tell her before she left that she was pregnant. (Id.)

8. Colorado's WIC (Women, Infants and Children) program provides food assistance and medical care to indigent persons.

five nights a week at the apartment. (Tr. at 182.) According to Ms. Sims, she assumed the two were a married couple. (Tr. at 125.)

Mother's daughter was born in February 2001. By March 13, 2002, circumstances changed again. Despite having an open hearing with two attorneys, direct, cross-, and rebuttal examination of witnesses, numerous briefs and supplemental filings, it is impossible to discern what exactly precipitated it, but on March 12, 2002, Mother and Father had an argument, Father took Omar to Joliet Circle, and the following day Mother left the Asbury apartment with her three-week old daughter and ended up at a shelter. Mother says Father "evicted" her. Father says there was an argument: Mother was unhappy he hadn't "fixed the immigration papers"; was threatening to leave for California with the children; and he said if you are not happy, "the door is there." (Tr. at 186–87.) I find the suggestion that Mother left voluntarily dubious given the very tender age of her infant daughter and the fact she had nowhere to go and no means or method of traveling to California. In response to an earlier question from his counsel, Father testified the lease at the apartment he had been sharing with his new wife expired so the two were now living in the apartment previously occupied by Mother (Tr. at 183) and there is some suggestion that this was what precipitated the argument. In his cross-examination of Mother, moreover, Father's counsel suggested the March 12 argument had been precipitated by news that Father and his new wife were going to buy a house together. (Tr. at 82.)

Whatever the circumstances, by March 13, 2002, Mother found herself in a shelter and Omar was with his Father. On April 5, 2002, Father filed his Verified Petition for Establishment of Parental Responsibility[9] and Mother was served with the Summons and Complaint in that action. Mother filed the instant Hague Convention Petition on April 14, 2002.

The question before me is whether the Convention applies under the facts and circumstances of this case and, if so, whether it compels me to send Omar back to Mexico with his Mother so a Mexican court can address any custody challenge by Father.

### III. *Applicable Law.*
### *Overview.*

The Tenth Circuit summarized the Convention[10] and applicable ICARA provisions in *Ohlander v. Larson,* 114 F.3d 1531, 1534 (10th Cir.1997), *cert. denied,* 522 U.S. 1052, 118 S.Ct. 702, —— L.Ed.2d —— (1998), as follows:

> The Hague Convention on the Civil Aspects of International Child Abduction (the "Convention"), as implemented by ... the United States Congress through the International Child Abduction Remedies Act, 42 U.S.C. §§§§ 11601–11610 (1994) (ICARA), ... was adopted by the signatory nations "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Hague Convention on the Civil Aspects of International Child Abduction, Dec. 23, 1981, Preamble, 51 Fed.Reg. 10494, 10498 (1986).

---

**9.** I note the Petition states Father has had 'continuous physical custody' of the child since September 2001 and states the child had been living with him at the Joliet Circle apartment 'at all times relevant [to his Petition].'

**10.** The full text of the Convention is set forth at Appendix B, 51 Fed.Reg. 10494, 10498–502.

The Convention is meant to provide for a child's prompt return once it has been established the child has been "wrongfully removed" to or retained in any affiliated state. *Id.*, art. 1, 51 Fed.Reg. at 10498.

Under the Convention, a removal or retention is "wrongful" if:

a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for removal or retention.

*Id.*, art. 3, 51 Fed.Reg. at 10498. Once a removal is deemed "wrongful," "the authority concerned shall order the return of the child." *Id.*, art. 12, 51 Fed.Reg. at 10499. However, the Convention provides for several exceptions to return if the person opposing return can show any of the following: 1) the person requesting return was not, at the time of the retention or removal, actually exercising custody rights or had consented to or subsequently acquiesced in the removal or retention, *id.*, art. 13a, 51 Fed. Reg. at 10499, 42 U.S.C. §§ 11603(e)(2)(A); 2) the return of the child would result in grave risk of physical or psychological harm to the child, *id.*, art. 13b, 42 U.S.C. §§ 11603(e)(2)(A); 3) the return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms," *id.*, art. 20, 51 Fed. Reg. at 10500, 42 U.S.C. §§ 11603(e)(2)(A); or 4) the proceeding

was commenced more than one year after the abduction and the child has become settled in the new environment, *id.*, art. 12, 51 Fed.Reg. at 10499, 42 U.S.C. §§ 11603(e)(2)(B).[11]

In applying this statutory framework, I am mindful that the merits of any competing claims to custody or changed circumstances are off limits in a proper application of the Convention: "The Convention and [ICARA] empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." 42 U.S.C. § 11601(b)(4); *see* Convention art. 19. The focus of the Convention is restoration of the status quo, i.e., "to re-establish a situation unilaterally and forcibly altered by the [wrongdoing parent]." Pérez–Vera Report at 429–30.

*Discussion and Conclusions of Law.*

To state a *prima facie* case for Omar's return to Mexico under the Convention, Mother must establish, by a preponderance of evidence, that (1) Omar's habitual residence "immediately before" the date of the alleged wrongful retention was Mexico; (2) that his retention is a breach of rights of custody she had under Mexican law; and (3) that she was actually exercising those rights of custody at the time of the removal/retention. *See Pesin v. Osorio Rodriguez*, 77 Fed.Supp.2d 1277, 1283 (S.D.Fl.1999) (citing Convention, art. 3). Thus, the threshold determination to be considered in this case is Omar's place of habitual residence at the time "immediately before" the date of the alleged wrongful retention.

1. *If March 2002 is the date of the alleged wrongful retention, Omar was a habitual resident of the Unit-*

---

11. The respondent has the burden of proving the second and third defenses by a clear and convincing evidentiary standard; the first and fourth may be established by a preponderance of evidence. 42 U.S.C. § 11603(e)(2).

*ed States and is not subject to immediate return to Mexico under the Convention.*

█ Based on Mother's testimony and evidence adduced from other witnesses at the hearing, I find Omar's presence in the United States was consensual from the time of his arrival until March 2002, after Mother had given birth to the child with which she was pregnant when she arrived and she and Father had a falling out. Mother's consent was withdrawn at that time, and she expressed an intent either to return to Mexico (her testimony) or to go to California (Father's testimony). Under this scenario, Father's retention of Omar became "wrongful" from Mother's perspective on March 12, 2002, when Father took Omar from the Asbury apartment he shared with Mother and brought him to Joliet Circle. The question to be decided, then, is whether Mexico remained Omar's "habitual residence" as of March 12, 2002, or whether it had shifted to the United States.

Courts in both the United States and foreign jurisdictions have defined "habitual residence" as " 'the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective.' " *Pesin,* 77 Fed.Supp.2d at 1284 (quoting *Feder v. Evans–Feder,* 63 F.3d 217, 224 (3d Cir.1995)) and *Friedrich v. Friedrich,* 983 F.2d 1396, 1401–03 (6th Cir.1993) (*Friedrich II* ) and *In re Bates,* No. CA 122–89, High Court of Justice, Family Div'l Ct. Royal Courts of Justice, United Kingdom (1989) and finding 23 day stay in Florida immediately before alleged wrongful retention insufficient to establish new "habitual residence" where trip was for vacation and parties had purchased round trip tickets from Venezuela to Florida and back).

█ Where a child is of tender years and cannot be expected "meaningfully and independently" to express his feelings regarding his habitual residence, courts should "consider the overtly-stated intentions and conduct of his parents in order to determine whether they formed the necessary "degree of settled purpose" that is required for habitual residence." *In re Morris,* 55 F.Supp.2d 1156, 1161 (D.Colo. 1999) (Babcock, C.J.) (citing *In re Bates* ). *Accord Pesin,* 77 F.Supp.2d at 1278 (where children were four and six years old at the time of alleged wrongful retention, court compelled "to focus on their parents' actions and shared intentions") (citing *Bates* ) *and Feder,* 63 F.3d at 224 (focus must be on parents' present, shared intentions regarding their child's presence in particular country). Where the duration of a young child's stay in a foreign country is intended to be indefinite, the habitual residence of a child is usually in that foreign country. *Morris* at 1161 (citing *Falls v. Downie,* 871 F.Supp. 100, 102 (D.Mass. 1994) and *Levesque v. Levesque,* 816 F.Supp. 662, 666 (D.Kan.1993)). Where the stay is intended for a limited, distinct period of time, courts are reluctant to find that a new habitual residence has been established. *Id.* (citation omitted).

In *Feder,* the Third Circuit found, based on parents' shared intentions, that Australia was four-year-old child's habitual residence despite fact that he spent the majority of his years in the United States. 63 F.3d at 224. In reversing the district court on this point, the Third Circuit found the trial court had disregarded the present, shared intentions of both parents, focusing instead on mother's exclusively and on facts indicating she did not intend to remain in Australia if her marriage to father did not work out. *Id.* Where parents' intent was to move to Australia with the child "for at the very least the foreseeable future" and then stayed there for nearly six months, "a significant period of time for a four-year old child," and where

the child attended preschool, the Court concluded the child "was habitually resident in Australia immediately prior to his retention by [mother] in the United States." I find the *Feder* case provides the best analogy to the facts and circumstances presented in this case. The parties' agreement, in September or October of 2001, that Omar would live with Mother at the Asbury apartment for at least the foreseeable future coupled with the fact that he did live at the apartment for at least five months during which he attended Kindergarten and participated in all of the activities central to a child's life, resulted in a change in Omar's habitual residence from Mexico to the United States.

This finding means only that Omar is not subject to immediate return to Mexico under the terms of the Convention. It says nothing about the wrongfulness of Father's actions under United States law or anything about the ultimate issue of custody. It simply signifies that a competent court of the State of Colorado will be making that judgment.

2. *Alternatively, if October 1, 2001 is the date of the alleged wrongful retention, Mother "acquiesced" in the retention by coming to the United States and living here, with the child, for a period of five months before changing her mind.*

Using Mother's date of October 1, 2001 as the date Father began wrongfully retaining Omar in the United States requires a different analysis, but yields the same result. As of October 1, 2001, it cannot be disputed that Omar's place of habitual residence was Mexico or that Mother was exercising custody rights in Mexico at the time she and Father arranged for him to cross the border and visit his Father in Colorado, and Mother would have carried her burden of establishing a *prima facie* case for Omar's return under the Convention. Father, however, asserts Mother

"consented to or subsequently acquiesced in the [retention]" within the meaning of article 13a of the Convention by coming to, and agreeing to remain in, the United States at least through her pregnancy and the birth of her second child.

The defense of consent or acquiescence under Convention article 13a must be established by a preponderance of the evidence, with the burden of persuasion on Father. 42 U.S.C. § 11603(e)(2)(B). I find Father has carried his burden in this case, and conclude Mother, after October 1, 2001, "subsequently acquiesced in" Omar's retention in the United States.

▮ Whatever her purpose in coming to Denver on October 15, Mother quickly decided once she arrived to stay for at least the foreseeable future. She moved into the Asbury apartment, began volunteering at Omar's school, received prenatal care and prepared for the arrival of her daughter. She told no one—not the child's teacher, not the school administrator, not her WIC technician, not the authorities—that the child was being retained against her will; she took no steps to secure the return of the child; and she said nothing about returning to Mexico after the child was born. I find Mother's post-retention conduct constitutes acquiescence in Omar's retention in the United States after October 1, 2001. By the time Mother filed her Hague Convention Petition in mid-April, Omar had been here, living primarily with her, with her consent and full participation in his life, for six months and without any timeline or stated intent on the part of his Mother to return to Mexico.

## IV. *Conclusion.*

In reaching my conclusions, it was my sincere attempt to do justice to each of these parent's testimony and recollection of events. The "truth," particularly when it involves one's children, is undoubtedly

colored by hindsight in such cases as well as one's perceptions and feelings about the child and the other parent. Whatever the "truth" of the parties' intent in bringing Omar to the United States or in Mother's remaining here with him for the time she did, the legal result is that Mother has lost her right to Omar's "immediate return" to Mexico under the Convention.

My findings and conclusions, however, should in no way suggest an opinion on the merits of Father's custody challenge or any belief that Omar should, or should not, return to Mexico with his Mother. It is limited, as it must be under the Convention, to an inquiry into the "wrongfulness" of Father's actions for purposes of determining venue, i.e., whether a return to Mexico for further custody proceedings is required by the Convention's terms in order to effect the Convention's purpose of returning to the status quo a situation "unilaterally" and "forcibly altered" by him. Because Omar's situation has been altered by the joint actions of both parents, I concluded the Convention simply does not apply. The "wrongfulness" of Father's actions in the context of the parties' custodial arrangements and dispute is for the Denver District Court to decide.

Finally, I state that my findings and conclusions were not informed by any of the evidence presented at the hearing by the parties with respect to their own or the other parent's moral fitness or the child's best interests. I note that it has been with Father's consent and support that the child has resided primarily with Mother since the parties' separation in 1997, including five of the seven months the child lived in the United States before Mother filed her Petition. It is my sincere hope that the parties, with the aid of a state court judge with expertise and wisdom in such matters, will come to an arrangement whereby Mother's living and financial situation can stabilize and parenting time can be shared in a manner that recognizes the past practices, and present needs, of each of the parties, including Omar. This child, as all children lucky enough to have them, needs both of his parents.